**Richard VIETH, Norma Jean Vieth, and Susan Furey, Plaintiffs,**

v.

**Commonwealth of PENNSYLVANIA, et al., Defendants.**

**Civ. No. 1:CV–01–2439.**

United States District Court, M.D. Pennsylvania.

Feb. 22, 2002.

Daniel T. Brier, Donna A. Walsh, Myers, Brier & Kelly, LLP, Scranton, PA, Robert B. Hoffman, Reed Smith LLP, Harrisburg, PA, Paul M. Smith, Thomas J. Perrelli, Bruce V. Spiva, Daniel P. Mach, Brian P. Hauck, Jenner & Block, L.L.C., Washington, DC, for plaintiffs.

J. Bart DeLone, Office of the Attorney General, Appellate Litigation Sect., John P. Krill, Jr., Linda J. Shorey, Helene Eichenwald Loux, Jason E. Oyler, Julia M. Glencer, Kirkpatrick & Lockhart LLP, Harrisburg, PA, for defendants.

### OPINION OF THE COURT[1]

Before the court are: (1) a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) filed by Defendants Commonwealth of Pennsylvania, Pennsylvania Governor Mark Schweiker, Secretary of State Kim Pizzingrilli, and Commissioner of the Bureau of Commissions, Elections, and Legislation Richard Filling ("Executive Officers"); (2) Defendant Executive Officers' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6); (3) a Rule 12(b)(1) motion to dismiss filed by Defendants Matthew Ryan and Robert Jubelirer ("Presiding Officers")[2]; and (4) Defendant Presiding Officers' motion to dismiss pursuant to Rule 12(b)(6). The parties have briefed the issues, and the matter is ripe for disposition.

## I. Background

### A. Factual Allegations

Plaintiffs Richard Vieth, Norma Jean Vieth, and Susan Furey brought this action, pursuant to 42 U.S.C. § 1983, against Defendant Commonwealth of Pennsylvania, Defendant Executive Officers, and Defendant Presiding Officers. Plaintiffs' claims arise out of the enactment of Pennsylvania Senate Bill 1200 ("Act 1"), Pennsylvania's Congressional redistricting plan, which Governor Schweiker signed into law on January 7, 2002.

Plaintiffs allege the following facts in their complaint: On December 28, 2000, the United States Secretary of Commerce reported the results of the year 2000 decennial national census to then President William J. Clinton. The tabulation indicated that as of April 1, 2000 Pennsylvania had a resident population of 12,281,054 persons. Accordingly, the Secretary of Commerce's report allotted Pennsylvania only nineteen Congressional representatives resulting in a decrease of two representatives from the results of the 1990 census.

1. RAMBO, SENIOR DISTRICT JUDGE authored the Opinion of the Court in which NYGAARD, CIRCUIT JUDGE and YOHN, DISTRICT JUDGE join.

2. Defendant Ryan is the Speaker of the Pennsylvania House of Representatives, and Defendant Jubelirer is the Lieutenant Governor of the Commonwealth of Pennsylvania. Thus, Speaker Ryan presides over the Pennsylvania House of Representatives, and Lieutenant Governor Jubelirer presides over the Pennsylvania State Senate.

Thus, the responsibility for adopting a Congressional redistricting plan fell to Pennsylvania's General Assembly, which failed to reach a compromise during the regular 2001 legislative session. The State House of Representatives passed one version, and the State Senate passed a different plan. The General Assembly, however, adjourned at an impasse on December 13, 2001.[3]

In the meantime, prominent national figures in the Republican party—such as congressional Speaker of the House Dennis Hastert, Congressman Thomas M. Davis III, United States Senator Rick Santorum, and Karl Rove, political consultant to current President George W. Bush—began pressuring Governor Schweiker, a Republican, and the Republican members of the General Assembly to adopt the Senate redistricting plan as a punitive measure against Democrats for having enacted apparently pro-Democrat redistricting plans in other states. In response, Republican members of the state House and Senate began working together to reach an agreement. In the process, they effectively ignored all Democratic members of the General Assembly, including members of the Conference Committee appointed to resolve the impasse between the competing plans.

At the Conference Committee meeting on January 2, 2002, the Republicans presented the final version ("Senate Bill 1200") of the new redistricting plan. The Democratic members of the Conference Committee had no input on this version. Although the bill passed the Conference Committee, thus sending it for a vote before both houses, all Democratic members of the Conference Committee voted against the version, and all Republicans voted in favor. On January 3, 2002, the General Assembly passed Senate Bill 1200. On January 7, 2002, Governor Schweiker signed the bill into law as Act 1.

Plaintiffs, registered Democrats and Pennsylvania citizens, subsequently filed this suit to enjoin Act 1's implementation. Plaintiffs Richard and Norma Jean Vieth both reside in Lebanon County, Pennsylvania, in a portion of the county that will fall in District 16 under Act 1. Plaintiff Susan Furey resides in Montgomery County, Pennsylvania. Under Act 1's precursor, Plaintiff Furey's residence fell in District 13. However, under Act 1, Plaintiff Furey now resides in District 6. Defendants are the Commonwealth of Pennsylvania and various executive and legislative officers who were either responsible for enacting Act 1 or will be responsible for implementing it during the next Congressional election.

According to the results of the 2000 census, Pennsylvania has a population of 12,281,054. When divided equally among the nineteen Congressional districts, this results in a population of 646,371 or 646,372 people per district.[4] However, under Act 1, District 7 would have a population of 646,380. On the other hand, Districts 1, 2, and 17 would each have a population of 646,361. Thus, under Act 1 there is a nineteen-person deviation between the least populated and most populated districts. While this is less than the deviation under the 1992 plan, unlike that plan, Act 1 splits eighty-four local governments (including twenty-five counties and fifty-nine cities, boroughs or townships) among different congressional districts. Montgomery County, where Plaintiff Furey resides, is divided up among six different congressional districts. Under the 1992 plan, only twenty-seven local governments (nineteen

---

**3.** Plaintiffs also allege that the Republican party enjoys majorities in both state houses and holds the Governor's office.

**4.** The actual result is 646,371.263157.

counties and eight cities, townships or boroughs) were split between different districts. Additionally, Districts 4, 6, 9, 10, 11, 13, 14, 15, and 19 have populations of over 646,372 without any legitimate justification.

Currently, the two major parties hold nearly equal support in the Commonwealth. Of voters registered with one of the two major parties, 53.6% are registered Democrats and 46.4% are registered Republicans. In November 2000, during the last election held under the 1992 plan, voters in Pennsylvania elected eleven Republican congressman and ten Democratic congressman to serve in Washington. In those twenty-one congressional races, Democrats garnered 50.6% of the aggregate vote, with Republicans receiving 49.4%. Democrats also received more total votes than Republicans, by a margin of 50.1% to 49.9%, in the five statewide races in 2000.[5] Yet despite this nearly equal split, Democrats will likely win only six of Pennsylvania's nineteen congressional seats. Thus, Act 1 is "designed to ensure that Republicans would win at least 13 of the 19 congressional seats." (Amd.Compl. at ¶ 32.) "It cements Republican power and effectively reduces Democrats to being a small minority of the Commonwealth's congressional delegation for the coming election and likely the coming decade." (*Id.* at ¶ 33.)

As a direct result, Act 1 "dramatically affects the Democratic Party's prospects for success in congressional elections in Pennsylvania ... and will reduce the choices that voters ... will have in Pennsylvania elections." (*Id.* at ¶ 35.) "Because of the bias ... the Democratic Party will have greater difficulty in fielding competitive candidates." (*Id.*) Thus, Act 1 operates "to essentially shut Democrats and Democratic voters out of the political process." (*Id.* at ¶ 36.) Plaintiffs, in particular, "will suffer harm ... [because they] will now be increasingly represented by members of Congress who do not represent their views." (*Id.* at 37.)

### B. *Procedural History*

On December 21, 2001, Plaintiffs filed the original complaint in this matter. Subsequently, Plaintiffs filed a motion to convene a three-judge panel pursuant to 28 U.S.C. § 2284(b)(1). By an order dated January 23, 2002, the court granted Plaintiffs' motion and requested that Chief Judge Edward Becker of the Third Circuit Court of Appeals appoint the members of the panel. Chief Judge Becker appointed the current panel: The Honorable Richard Nygaard, United States Circuit Judge for the Third Circuit Court of Appeals; The Honorable William H. Yohn, Jr., United States District Judge for the Eastern District of Pennsylvania; and The Honorable Sylvia Rambo, Senior United States District Court Judge for the Middle District of Pennsylvania.

On January 11, 2002, Plaintiffs filed an amended complaint alleging violations of 42 U.S.C. § 1983.[6] In that document,

---

**5.** In 2000, Pennsylvania held statewide elections for President, one United States Senate position, State Attorney General, State Auditor General, and State Treasurer. Democratic candidates won the elections for President and Auditor General, and Republican candidates won the elections for Attorney General, State Treasurer and United States Senator.

**6.** Plaintiffs include the violation of § 1983 under a separate count. However, "§ 1983

does not create substantive rights but 'merely redresses the deprivation of ... rights ... created by the Constitution or federal statute.' " *Ridgewood Bd. of Educ. v. N.E. for M.E.,* 172 F.3d 238, 251–52 (3d Cir.1999) (quoting *W.B. v. Matula,* 67 F.3d 484, 493 (3d Cir.1995)). Therefore, the court will construe Plaintiffs' amended complaint as an action brought pursuant to § 1983 to vindicate their rights under the Constitution.

Plaintiffs allege that Act 1 violates: (1) Article I, § 2 of the United States Constitution; (2) the Equal Protection Clause of the Fourteenth Amendment; (3) the Privileges and Immunities Clause of the Fourteenth Amendment; and (4) Plaintiffs' right to free association guaranteed by the First Amendment. Accordingly, Plaintiffs seek the following declaratory and injunctive relief: (1) a declaratory judgment that Act 1 violates Plaintiffs' constitutional rights; (2) a permanent injunction preventing Defendants from implementing Act 1; (3) a court order establishing a new congressional redistricting plan and enjoining Defendants from enacting or implementing a new plan until the 2004 elections; and (4) attorney's fees and court costs.

On January 22, 2002, Plaintiffs filed a motion requesting that the court set a deadline of February 18, 2002 for the state courts to conclude all litigation pertaining to Act 1.[7] Additionally, Plaintiffs filed an expedited motion for appointment of the three-judge panel. By an order dated January 24, 2002, the court denied Plaintiffs' motion to set a deadline and denied, as moot, Plaintiffs' expedited motion to convene a three-judge panel. By a separate order issued on January 24, 2002, the court set the case for an evidentiary hearing to be conducted on February 11 and February 12, 2002.

Also on January 24, 2002, both Defendant Presiding Officers and Executive Officers filed the separate motions to dismiss which are currently before the court. Defendant Presiding Officers followed this with a motion to abstain, filed on January 25, 2002. By separate orders, the court established an expedited briefing schedule for both the motions to dismiss and the motion for abstention.

Defendant Presiding Officers filed a motion for reconsideration and *vacatur* of the court's January 24, 2002 order that set the captioned matter for an evidentiary hearing starting February 11, 2002. The court held a telephone conference on January 29, 2002, which all parties attended, in order to discuss the reconsideration motion. During the conference call, counsel informed the court that the Supreme Court of Pennsylvania issued an order that afternoon requiring the Commonwealth Court to hold a hearing on Act 1 by February 1, 2002. Additionally, the Supreme Court of Pennsylvania ordered the Commonwealth Court to issue findings of fact and conclusions of law by February 8, 2002 addressing the validity of Act 1 under the Pennsylvania Constitution. In light of these circumstances, by an order dated January 30, 2002, the court delayed the evidentiary hearing until March 11, 2002 and set an expedited discovery schedule.

## II. *Discussion*

### A. *Motion to Dismiss pursuant to Rule 12(b)(1)*

#### 1. *Legal Standard*

■ "A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint." *Ballenger v. Applied Digital Solutions, Inc.*, 2002 WL 169253 at *2, 2002 U.S.Dist. LEXIS 1518 at *8 (D.Del. January 31, 2002). The motion should be granted where the asserted claim is "insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Coxson v. Commonwealth of Pennsylvania*, 935 F.Supp. 624, 626 (W.D.Pa.1996)

---

**7.** Currently, there is a state court action pending which attacks Act 1 on the basis that it violates the Pennsylvania Constitution. *See*

*Efer v. Commonwealth of Pennsylvania*, 10 M.D. 2002 (Pa.Commw.Ct.).

(citing *Growth Horizons v. Delaware County,* 983 F.2d 1277, 1280–81 (3d Cir. 1993)). Additionally, a motion to dismiss under Rule 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *See Mortensen v. First Federal Savings and Loan,* 549 F.2d 884, 891 (3d Cir.1977).

This case presents a facial challenge because Defendants do not dispute, at this juncture, the existence of the jurisdictional facts alleged in the complaint. *See* 2 James Wm. Moore *et al.,* Moore's Federal Practice ¶ 12.30[4] (3d ed.1999) (explaining the difference between a facial and factual challenge to subject matter jurisdiction pursuant to Rule 12(b)(1)). Therefore, the court must accept the facts alleged in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990).

### 2. *Partisan Gerrymandering Claim*

■ In their motions to dismiss, Defendants contend that claims of partisan gerrymandering are non-justiciable. Thus, according to Defendants, the court lacks subject matter jurisdiction to hear such claims. However, Defendants also acknowledge that in *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), the Supreme Court held that such claims are justiciable as equal protection violations. Instead of arguing for dismissal, Defendants wish to have their objections to this holding noted on the record in case they seek to raise the issue at a later time. Accordingly, the court notes the objection.

### 3. *Eleventh Amendment Immunity*

■ Defendant Commonwealth of Pennsylvania seeks dismissal of the claims against it arguing that it is immune from suit in federal court based on Eleventh Amendment sovereign immunity. At a minimum, the Eleventh Amendment stands for two propositions: "first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (internal quotations omitted). Thus, the Eleventh Amendment "prohibits federal courts from entertaining suits by private parties against States and their agencies." *Alabama v. Pugh,* 438 U.S. 781, 791, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). This bar applies regardless of whether the plaintiff seeks monetary damages or injunctive relief against a State. *Seminole Tribe,* 517 U.S. at 58, 116 S.Ct. 1114 (citing *Cory v. White,* 457 U.S. 85, 90, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982) ("It would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the State itself simply because no money judgment is sought.")).

Under certain circumstances, the Eleventh Amendment does not bar federal courts from entertaining suits against States. First, suit is permitted where the State has waived its immunity. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). Second, sovereign immunity does not apply if Congress validly abrogates it through its enforcement powers pursuant to the Fourteenth Amendment. *Seminole Tribe,* 517 U.S. at 57–73, 116 S.Ct. 1114. Third, Eleventh Amendment immunity is inapplicable where the plaintiff sues State officials in their official capacity seeking only prospective relief. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

In this case, Plaintiffs have brought suit against the Commonwealth thereby implicating its sovereign immunity. Plaintiffs

do not contend that the Commonwealth has waived its immunity, nor could they. Pennsylvania has clearly reserved its power to invoke sovereign immunity. 42 Pa. Cons.Stat.Ann. § 8521(b) (2001). Likewise, Plaintiffs could not contend that by enacting § 1983, Congress validly abrogated Pennsylvania's sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) ("[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States."). *Ex Parte Young* is not implicated here. The Commonwealth is the only defendant to raise sovereign immunity as a defense.

Because the Eleventh Amendment bars suit against the Commonwealth of Pennsylvania under the circumstances present in this case, the court will dismiss the action against the Commonwealth for lack of subject matter jurisdiction.

### 4. *Standing*

The constitutional minimum of standing contains three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of ... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted). The party who seeks the exercise of jurisdiction bears the burden of alleging facts that "he is a proper party to invoke judicial resolution of the dispute." *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

### a. Partisan Gerrymandering

■ Defendants contend that Count II of Plaintiffs' amended complaint, alleging that Act 1 constitutes impermissible partisan gerrymandering in violation of the Equal Protection Clause, must be dismissed because Plaintiffs lack standing. The crux of Defendants' argument is that Plaintiffs do not have standing to challenge Act 1 as a whole.[8]

Defendants would have the court apply the standing requirement for racial gerrymandering cases to those involving only partisan gerrymandering. In the context of racial gerrymandering, in order to have standing a plaintiff must allege that he resides in a district that has been impermissibly gerrymandered on the basis of race. *United States v. Hays*, 515 U.S. 737, 743–44, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). Racial gerrymandering is prohibited because, where a district is created solely to serve the perceived common interests of one racial group, it is reasonable to presume that elected officials in such districts will ignore the plights of non-members of the dominant racial group. This stems from the corollary that racial

---

**8.** Defendants also argue that Plaintiffs have failed to establish standing because Plaintiffs "allege only group harm (i.e., to Democrat voters & the Democrat Party), not harm to their individual interests." (Def.Pres.Offs.Br. in Sup.Mot. to Dis. at 6.) However, Defendants overlook the fact that Plaintiffs allege harm to them as individual members of the Democratic party.

classifications are disfavored in general because they threaten to stigmatize individuals according to their race and incite racial hostility. *Id.* at 744, 115 S.Ct. 2431 (citing *Shaw v. Reno,* 509 U.S. 630, 648, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)). Therefore, only where a person resides in a district created to cater to one race over another can he allege to have suffered the particularized harm necessary to justify standing. "On the other hand, where a plaintiff does not live in such a district, he ... does not suffer those special harms, and any inference that the plaintiff has personally been subject to a racial classification would not be justified absent evidence tending to support that inference." *Id.* at 745, 115 S.Ct. 2431.

The reasoning underlying claims based on racial gerrymandering, however, is quite distinct from the type of injury that partisan gerrymandering inflicts. The very nature of a claim of partisan gerrymandering contemplates a harm which extends beyond that inflicted upon a particular voter. Rather, such a claim envisions harm to a particular class of voters that results in impermissibly denying them participation in the political process. The Supreme Court recognized this principal in *Davis v. Bandemer,* the first case holding that partisan gerrymandering may be actionable as a violation of equal protection. In that decision, the Court stated: "Although the statewide discrimination here was allegedly accomplished through the manipulation of individual district lines, the focus of the equal protection inquiry is necessarily somewhat different from that involved in the review of individual districts." 478 U.S. at 127, 106 S.Ct. 2797.[9]

In equal protection claims based on partisan gerrymandering, the allegation is that an identifiable political group has had its political voice silenced through the drawing of elective district lines. Although this involves, to a certain extent, manipulation of individual district lines, the injury is done to the entire identifiable political group. The constitutional injury lies not in inequality among various individual districts, but rather in the configuration of the districts as a whole when they serve to disadvantage a certain class of voters. Therefore, unlike a claim for race-based gerrymandering, a plaintiff in a partisan gerrymandering claim need not allege that he lives in a particular district that has been gerrymandered on the basis of political affiliation.

Additionally, we do not agree with Defendants that adopting such a standing rule would endow nationwide standing upon all individual members of the major political parties. In the context of partisan gerrymandering, to satisfy the particularized harm requirement, a plaintiff must allege that he or she is a member of a politically salient class whose geographical distribution is sufficiently ascertainable that it could have been taken into account when drawing district boundaries. In this case, Plaintiffs allege that they are citizens of Pennsylvania and members of the Democratic party. Additionally, they allege that Defendants have utilized the congressional redistricting process to vanquish Plaintiffs' political voice in Congress. These allegations, together, are sufficient to satisfy the particularized injury requirement for standing.

### b. Remaining Claims

■ As to the remaining claims, Defendants intimate that Plaintiffs do not have

---

9. Moreover, we note that to the extent that an individual plaintiff is required to live in an allegedly gerrymandered district, Plaintiffs have met that requirement. Plaintiff Furey lives in District 6. (Amd.Compl. at ¶ 4.) Plaintiffs allege that District 6 is one of the gerrymandered districts. (Amd.Compl. at ¶ 22.)

standing because the injury that they allege is "speculative and generalized," (Def.Exec.Offs.Br. in Sup.Mot. to Dis. at 7,) and is "a purely hypothetical harm, tied to the allegation of partisan gerrymandering." (Def.Pres.Offs.Br. in Sup.Mot to Dis. at 7.) We disagree.

Defendants are correct that Plaintiffs do not allege that they have suffered an injury in fact as of this moment. However, Act 1 has yet to be implemented. Plaintiffs have clearly alleged that if Act 1 is allowed to be implemented it will cause a very real harm. Principally, Plaintiffs claim that their vote has been diluted in violation of the one person-one vote requirement of Article I. That harm is completely distinct from the harm that would be inflicted as a result of partisan gerrymandering. Act 1 has been enacted and, as of now, is scheduled to be used as the congressional district plan in the 2002 elections. If Act 1 is—as Plaintiffs have alleged—unconstitutional, then Plaintiffs have alleged a harm that is "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Therefore, the court has no problem concluding that Plaintiffs have alleged an injury in fact.[10] Likewise, Plaintiffs have sufficiently pleaded a causal connection between Defendants' conduct and the injury. Finally, as will be discussed below, *see infra* at Part II.B.7, the court has the remedial powers to redress the injuries that Plaintiffs have alleged. In short, the court finds that the allegations of Counts I, III, and IV of Plaintiffs' amended complaint satisfy the constitutional minimum of standing.

**B. *Motion to Dismiss pursuant to Rule 12(b)(6)***

**1. *Legal Standard***

In deciding a motion to dismiss pursuant to Federal Rule 12(b)(6), the court is required to accept as true all of the factual allegations in the complaint and all reasonable inferences that can be drawn from the face of the complaint. *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). "The complaint will be deemed to have alleged sufficient facts if it adequately put[s] the defendant[s] on notice of the essential elements of the plaintiff's cause of action." *Id.* The court will not dismiss a complaint for failure to state a claim "unless it appears beyond a doubt that the plaintiff[s] can prove no set of facts in support of [their] claim that would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

"In determining whether a claim should be dismissed under [Federal] Rule 12(b)(6), a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). However, the court may consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] document[s]." *Pension Ben. Guar. Corp. v. White Consol. Ind,* 998 F.2d 1192, 1196 (3d Cir.1993).

**2. *Article I (One person-One vote)***

■ In Count I of their amended complaint, Plaintiffs allege that Act 1 violates Article I, § 2 of the United States Constitution [11] by diluting the vote of persons

---

**10.** As to the one person-one vote claim, the court notes that no Plaintiff resides in an under populated district. Additionally, Plaintiffs have alleged that there are districts that are under populated. Therefore, according to Plaintiffs' allegations, they have suffered an injury in fact due to vote dilution.

**11.** In relevant part, Article I, § 2 states: "[Congressional] Representatives ... shall be apportioned among the several States which may be included within this Union, according their respective Numbers...."

living in over-populated congressional districts. Defendants contend that this claim must be dismissed because Plaintiffs have failed to allege that: (1) a plan with smaller population deviations than Act 1 could have been enacted; or (2) that the deviations in Act 1 were unavoidable.

Article I, § 2, requires that members of Congress are chosen with equal representation for equal numbers of people. *Wesberry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). This Constitutional mandate, commonly referred to as the one person-one vote principle, requires "that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.* As the Supreme Court has explained:

> "[T]he 'nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality.... Unless population variances among congressional districts are shown to have resulted, despite such effort, the State must justify each variance, *no matter how small*.... [Article I, § 2, therefore] permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown."

*Kirkpatrick v. Preisler,* 394 U.S. 526, 530–31, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) (emphasis added).

Thus, in a challenge to a congressional redistricting plan, the plaintiff bears the initial burden of proving that the differences in district-to-district population could have been reduced or eliminated by "a good-faith effort to draw districts of equal population." *Karcher v. Daggett,* 462 U.S. 725, 730, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). If the plaintiffs can demonstrate that the differences in population were not the result of a good-faith effort to achieve equality in population between the various districts, then the State

must prove that some legitimate reasons justifies the variances. *Id.* at 731, 103 S.Ct. 2653.

Defendants argue that this claim should be dismissed because Plaintiffs have not offered a plan with smaller deviations, and Plaintiffs have not demonstrated that the deviations in Act 1 were unavoidable. According to Defendants, although there are variations in Act 1, they equal 0.00%. Therefore, "[a]s a matter of law, the district populations are equal and there is no significant variance between districts to be explained." (Def.Pres.Offs.Br. in Sup.Mot. to Dis. at 8.) However, the Supreme Court has squarely rejected any *de minimis* exception to the requirement of absolute equality in population between districts. *Karcher,* 462 U.S. at 734, 103 S.Ct. 2653 ("[T]here are no *de minimis* variations, which could practically be avoided, but which nonetheless meet the standard of Art. I, § 2 without justification.") "Article I, § 2, ... permits only the limited population variations which are unavoidable despite a good faith effort to achieve absolute equality, or for which justification is shown." *Id.* at 730, 103 S.Ct. 2653. Contrary to Defendants' contention, the only variations which are per se excusable are those which are unavoidable. For example, Pennsylvania's population of 12,281,-054 does not divide equally between its allotted nineteen districts. Therefore, if all of the districts under Act 1 had populations of 646,371 or 646,372, then the court could conclude that the differences in population were unavoidable and would not have to examine whether Act 1 was enacted in good faith.

However, according to Plaintiffs' allegations, this is simply not the case. District 7, the most populated district, has a population of 646,380, and Districts 1, 2, and 17, the least populated districts, have populations of 646,361; a maximum difference in

population of nineteen. These variances, therefore, are not per se unavoidable. *See e.g. Anne Arundel County Republican Cent. Comm. v. State Admin. Bd. of Election Laws,* 781 F.Supp. 394, 395–96 (D.Md. 1991) (holding that a maximum deviation of ten between the most populated and the least populated districts does not satisfy *Karcher's* requirement of absolute equality). Plaintiffs also allege that Act 1's variances are not the result of a good-faith effort to achieve population parity, but rather are part of a Republican plan to eliminate Democratic representatives from Congress. Additionally, Plaintiffs make several factual allegations that, if proven, would tend to undermine any justification Defendants might proffer in support of Act 1's population variances.

Defendants cite *Karcher* for the proposition that Plaintiffs must allege that a plan with smaller deviations was possible. The court finds that argument unpersuasive. In *Karcher,* the plaintiffs provided the court with an alternative plan as evidence that the challenged plan was not the result of a good-faith effort to achieve district population parity. 462 U.S. at 726, 103 S.Ct. 2653. That case, however, had proceeded beyond the Rule 12(b)(6) stage. While Plaintiffs may have to provide such a plan in order to satisfy their ultimate burden of persuasion in this case, there is nothing in the *Karcher* decision indicating that such a plan must be alleged in the complaint. Plaintiffs, therefore, have pleaded a prima facie violation of the one person-one vote command of Article I, § 2. Accordingly, the court will deny Defendants' motion to dismiss Count I of Plaintiffs' amended complaint.

### 3. *Equal Protection (Partisan Gerrymandering)*

■ In *Davis v. Bandemer,* the Supreme Court first recognized that claims for violation of equal protection based on partisan gerrymandering present justicia-

ble issues. 478 U.S. at 123–26, 106 S.Ct. 2797. Although that holding commanded a majority, only a plurality of the court endorsed the standards setting out what constitutes such a violation. Where a fragmented Court decides a case and no single rationale earns the endorsement of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Therefore, we may correctly view the plurality's analysis in *Bandemer* as constituting the governing standards to be applied in this case. *Accord Pope v. Blue,* 809 F.Supp. 392, 395 (W.D.N.C.1992); *Republican Party v. Wilder,* 774 F.Supp. 400, 403–04 (W.D.Va. 1991); *Badham v. Fong Eu,* 694 F.Supp. 664, 668 (N.D.Cal.1988).

In *Bandemer,* a plurality of the Court held that a plaintiff, in order to succeed on an equal protection claim of partisan gerrymandering, must "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." 478 U.S. at 127, 106 S.Ct. 2797. With this standard in mind, we now examine Plaintiffs' amended complaint in order to determine whether they have alleged facts that, if proven, would constitute an equal protection violation.

#### a. Identifiable Political Group

Defendants initially argue that Plaintiffs have failed to allege facts that could establish that they are members of an identifiable political group. Specifically, Defendants contend that Plaintiffs have failed to allege facts demonstrating that Democrats in Pennsylvania vote as a block. However, Defendants do not point to any authority which would require such an allegation. The court has scoured the *Bandemer* decision and has found no such requirement.

Instead, the court finds that *Bandemer* indicates that Plaintiffs must allege only that they are members of an identifiable political group whose geographical distribution is sufficiently ascertainable that it could have been used in drawing electoral district lines. Clearly, by alleging that they are Pennsylvanian citizens who vote for Democrats, Plaintiffs have satisfied this requirement.

### b. Discriminatory Intent

Both parties appear to recognize that the intent requirement in this case has been met. As the *Bandemer* plurality pointed out, "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." *Id.* at 128, 106 S.Ct. 2797. In this case, Plaintiffs allegations—that the Republican majority in the Pennsylvania General Assembly prevented all Democratic input on Act 1 in order to establish a Republican super-majority in Pennsylvania's congressional caucus—are sufficient to satisfy their pleading requirement.

### c. Actual Discriminatory Effects

The analysis as to the actual discriminatory effect is not nearly as simple. It appears that the effects analysis itself involves another two-pronged determination. First, Plaintiffs must prove an actual or projected history of disproportionate election results. Second, Plaintiffs must prove that "the electoral system is arranged in a manner that will consistently degrade a voter's, or group of voters', influence on the political process as a whole." *Id.* at 110, 106 S.Ct. 2797. While Plaintiffs' allegations may be sufficient to satisfy the first requirement as a projection of disproportionate election results, they do not indicate that Plaintiffs have been, or will be, prevented from participating in the political process. Even assuming *arguendo* that Plaintiffs' allegations are true, the

court will dismiss Plaintiffs' equal protection claim because Plaintiffs have not alleged facts indicating that as a result of Act 1 Plaintiffs will be completely shut out of the political process.

We begin our analysis by stating that the recondite standard enunciated in *Bandemer* offers little concrete guidance. However, the result may assist us. In that case, Republicans enjoyed majorities in both houses of the state legislature, and the Governor was a Republican. Exploiting these majorities, the Republicans adopted a state legislature redistricting plan that heavily favored Republicans. The plaintiffs in *Bandemer* filed suit challenging the plan as a violation of equal protection. At trial before a three-judge panel, the plaintiffs presented the following evidence: (1) of the statewide votes cast in the elections for the State House of Representatives, Democratic candidates received 51.9% of the vote, but won only forty-three of the 100 seats available; (2) of the statewide votes cast in the elections for the State Senate, Democratic candidates received 53.1% of the vote, but won only thirteen of the twenty-five seats available; (3) in two counties where 46.6% of the voting population tended to vote Democrat on a regular basis, Republicans won 85% of the seats available—eighteen out of twenty-one; (4) the plan disregarded political subdivision boundaries defining communities of interest; and (5) the plan disregarded the one person-one vote imperative and the Voting Rights Act's no retrogression requirement. 478 U.S. at 116, 134, 106 S.Ct. 2797. On this evidence, the panel held that the plan violated equal protection as a partisan gerrymandering.

A plurality of the Supreme Court, however, overturned that result. In doing so, the Court held that the evidence failed to establish that the redistricting plan had a

sufficiently adverse impact on the Indiana Democrats to constitute a violation of the Equal Protection Clause. *Id.* at 129, 106 S.Ct. 2797. Specifically, the Court stated that "the mere lack of proportional representation will not be sufficient to prove unconstitutional discrimination. Again, without specific supporting evidence, a court cannot presume in such a case that those who are elected will disregard the disproportionately underrepresented group." *Id.* at 130, 106 S.Ct. 2797. According to the Court, the plaintiffs failed to provide any such evidence and, therefore, failed to establish an equal protection violation.

The three-judge panel in *Badham v. Fong Eu*[12] applied the *Bandemer* standard and concluded that the plaintiffs there had not satisfied their burden of alleging that California's congressional redistricting plan resulted in Republicans being shut out of the political process as a whole. 694 F.Supp. at 670–71. In that case, an outgoing Democratic Governor colluded with the Democratic majority in the state legislature to pass a congressional redistricting plan that heavily favored Democratic candidates. In the first election held under that plan, Republicans received 50.1% of the vote statewide, but received only 40% of the congressional seats (eighteen of forty-five). The defendants filed a Rule 12(b)(6) motion to dismiss. The panel granted the motion holding that the plaintiffs had failed to allege facts that, if proven, would demonstrate an actual discriminatory effect on Californian Republicans.

The *Badham* panel focused its analysis on the effects the plan would have on California's political landscape as a whole.

It is on this second prong of the "effects" threshold that plaintiffs' complaint falters. Specifically, there are no factual allegations regarding California Republicans' role in the political process as a whole.... There are no allegations that California Republicans have been "shut out" of the political process, nor are there allegations that anyone has ever interfered with Republican registration, organizing, voting, fund-raising, or campaigning. Republicans remain free to speak out on issues of public concern; plaintiffs do not allege that there are, or have been, any impediments to their full participation in the uninhibited, robust, and wide-open public debate on which our political system relies....

Particularly conspicuous by its absence is any allegation that plaintiffs' interests are being entirely ignored by their congressional representatives.... Instead, plaintiffs claim that Democratic incumbents will be reelected without need to attend to the views of fragmented and submerged Republican minorities in their districts ... Nowhere do plaintiffs suggest that they can prove disregard by any means other than by inference from the election results, a method which *Bandemer* removes from our purview.

---

**12.** Although the Supreme Court did not grant *certiorari* to hear the *Badham* case, it did summarily affirm the three-judge panel's decision. *See Badham v. Eu,* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989). Unlike a denial of *certiorari,* a summary affirmation by the Supreme Court creates precedential authority binding on the lower courts. *See* 12 Moore's Federal Practice ¶ 400.05–1 (3d ed.1999). This authority extends only to the judgment's result, and not the underlying reasoning. *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). "Nevertheless, due in particular to the fact that the *Bandemer* Court was unable to agree on a majority opinion, we believe that the *Badham* court's interpretation of *Bandemer,* subsequently affirmed by the Supreme Court, is entitled to substantial deference." *Pope v. Blue,* 809 F.Supp. at 395 n. 2.

*Badham*, 694 F.Supp. at 670–71 (internal quotations omitted).

In this case, Plaintiffs' allegations amount to this; Act 1 is rigged to guarantee that thirteen of Pennsylvania's nineteen congressional representatives will be Republicans. As a result, Democrats will have a more difficult time electing their candidates. Due to this impediment, "the Democratic Party will have greater difficulty in fielding competitive candidates." (Amd.Compl. at ¶ 35.) Thus, Act 1 operates "to essentially shut Democrats and Democratic voters out of the political process." (*Id.* at ¶ 36.) Plaintiffs, in particular, "will suffer harm ... [because they] will now be increasingly represented by members of Congress who do not represent their views." (*Id.* at 37.)

As *Bandemer* and *Badham* dictate, these allegations are insufficient to make out a cause of action for violation of equal protection. First, Plaintiffs' allegation that Republicans will earn a super-majority of the congressional representatives despite their status as a minority party statewide is simply an argument for proportional representation. However, *Bandemer* soundly rejected such a basis for an equal protection violation. *See* 478 U.S. at 130, 106 S.Ct. 2797 ("Our cases, however, clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be.")

Second, *Bandemer* was equally forceful in rejecting the presumption that voters who vote for losing candidates will not be adequately represented. *See id.* at 132, 106 S.Ct. 2797 ("An individual or a group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and has as much opportunity to influence that

candidate as other voters in the district."). Therefore, Plaintiffs' allegation that they will be represented in Congress by Republicans who do not share their views bears no weight in our analysis.

Third, Plaintiffs' allegations that, due to Act 1, the Democratic party will have a greater difficulty in fielding competitive candidates is irrelevant. The focus in our inquiry is on the effect that the redistricting plan will have on an identifiable political group. In this case, as previously stated, that group is Pennsylvania Democratic *voters.* Therefore, the focus is on the effect Act 1 will have on the voters' ability to participate in the political process, not the Democratic party's health in Pennsylvania. The Constitution protects against partisan gerrymandering only because of the effect that it has on the individual's ability to exercise the fundamental right to vote. It goes without saying that political parties, although the principal players in the political process, do not have the right to vote. Therefore, their health is a non-issue in the constitutional analysis. Stripped to its bones, Plaintiffs' allegations, in this respect, amount to a claim that Act 1 will make it more difficult for them to elect Democratic candidates to Congress. However, this simply is not the end-all be-all constitutional analysis that Plaintiffs make it out to be.

> [T]he mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect representatives of its choice does not render that scheme constitutionally infirm. This conviction, in turn, stems from a perception that the power to influence the political process is not limited to winning elections.... Thus, a group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme makes winning elections more difficult, and a failure of proportional representa-

tion alone does not constitute impermissible discrimination under the Equal Protection Clause.

*Id.* at 131–32, 106 S.Ct. 2797.

Finally, we find that Plaintiffs' allegations do not indicate that Act 1 "essentially shuts ... Democratic voters out of the political process." (Amend.Compl. at ¶ 36.) While Plaintiffs employ this phrase in their complaint, these words do not have the talismanic effect of converting Act 1 into an actionable constitutional violation. *See Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) (holding that when deciding a Rule 12(b)(6) motion to dismiss, the court must treat a plaintiff's allegations as true, but need not give such credence to legal conclusions). While Plaintiffs allege that Democratic members of the Pennsylvania General Assembly were shut out of the redistricting process, there are no allegations that anyone has ever prevented, or will ever prevent, Plaintiffs from: registering to vote; organizing with other like-minded voters; raising funds on behalf of candidates; voting; campaigning; or speaking out on matters of public concern. *See Badham,* 694 F.Supp. at 670. Act 1 simply does not address such issues. In short, "[P]laintiffs do not allege that there are, or ever have been, any impediments to their full participation in the 'uninhibited, robust, wide-open' public debate on which our political system relies." *Id.* (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

In summation, Plaintiffs have not alleged facts indicating that they have been shut out of the political process and, therefore, they cannot establish an actual discriminatory effect on them. Because the court holds that Plaintiffs' allegations are insufficient to pass the threshold effects analysis, the court will dismiss that portion of the complaint alleging that Act 1 violates the Equal Protection Clause.

### 4. *Privileges and Immunities*

In Count III of the amended complaint, Plaintiffs assert that Act 1 violates their rights pursuant to the Privileges and Immunities Clause of the Fourteenth Amendment.[13] However, the Third Circuit has recognized that "the Privileges and Immunities Clause of the Fourteenth Amendment has 'remained essentially moribund' since the Supreme Court's decision in *The Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872), and the Supreme Court has subsequently relied almost exclusively on the Due Process Clause as the source of unenumerated rights." *In re Sacred Heart Hosp.,* 133 F.3d 237, 244 (3d Cir.1998).

Plaintiffs, though, argue that Act 1 "grants Republicans their right to be free of a district that does not impermissibly burden their rights to an undiluted vote, but it denies that right to Democrats." (Pls.Br. in Opp.Mot. to Dis. at 20.) Therefore, according to Plaintiffs, there must be some legitimate governmental purpose for Defendants' actions. In support for this contention, Plaintiffs rely entirely upon *Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). In *Saenz,* the Court held unconstitutional a California statute that limited the welfare benefits of new residents during their first year of residency in that state. The statute, the Court reasoned, violated the fundamental right of citizens to travel from state to state. In making this determination, the Court held that the statute violated the third element of the right to travel—the right of the newly-arrived citizen to enjoy

---

**13.** In relevant part, the Fourteenth Amendment reads: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States...." U.S. Const. amend. XIV, § 1.

the same privileges and immunities "enjoyed by other citizens of the same State." *Id.* at 502, 119 S.Ct. 1518.

Plaintiffs, however, do not explain how the right to travel, which apparently is protected in some part by the Privileges and Immunities Clause, translates into a right to have proportional representation with Republican voters. Simply put, the Privileges and Immunities Clause, which protects against discrimination on the basis of state citizenship, has nothing to do with this case. In this case, there are no allegations that Plaintiffs are newly-arrived citizens of Pennsylvania or that they are citizens of other states. In fact, the amended complaint clearly states that both Plaintiffs and Defendants are citizens of Pennsylvania. (*See* Amd.Compl. at ¶¶ 2–5.) Because Plaintiffs have failed to allege a cause of action for violation of the Privileges and Immunities Clause, the court will dismiss Count III of the amended complaint.

### 5. *First Amendment*

■ In Count IV of the amended complaint, Plaintiffs assert that Act 1 violates their right to free association as guaranteed to them by the First Amendment. The gravamen of Plaintiffs' claim is that Act 1 constitutes a governmental classification based on political affiliation and, thus, violates their right to free association.

It is well established that the "First Amendment protects political association as well as political expression." *Buckley v. Valeo*, 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). However, Plaintiffs fail to explain how Act 1 penalizes them for their exercise of First Amendment rights. Instead, Plaintiffs try to analogize their claim to a ballot access denial or a denial of the right to vote. However, nowhere in Plaintiffs' amended complaint do they allege that Act 1 prevents them from voting or having access to the ballot. Instead,

Plaintiffs imply that Act 1 makes it more difficult for them to exercise these rights.

It is true that the First Amendment guarantees participation in the political process. However, as the legion of case law and common sense dictate, it does not guarantee that such participation will be successful. *Accord Republican Party v. Martin*, 980 F.2d 943, 960 (4th Cir.1992); *Pope v. Blue*, 809 F.Supp. at 398; *Badham*, 694 F.Supp. at 675. "Because there is 'no device that directly inhibits participation in the political process,' [Plaintiffs'] freedom of association claim boils down to the argument that they are entitled to political success." *Pope*, 809 at 398. This is a right which the Constitution does not guarantee. Therefore, we hold that the Plaintiffs' freedom of association claim is coextensive with their equal protection claim. *Accord Id.* As discussed above, *see supra.* Part II.B.3, Plaintiffs have not stated a claim for a recognized violation of the Fourteenth Amendment. Therefore, the court will dismiss Plaintiffs' claim in Count IV for failure to state a claim for violation of their First Amendment right to free association.

### 6. *42 U.S.C. § 1983*

In Count V, Plaintiffs assert a claim based on violation of 42 U.S.C. § 1983. However, as previously stated, *see supra*, at 536, n. 6, "§ 1983 does not create substantive rights but 'merely redresses the deprivation of ... rights ... created by the Constitution or federal statute.'" *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 251–52 (3d Cir.1999) (quoting *W.B. v. Matula*, 67 F.3d 484, 493 (3d Cir. 1995)). Accordingly, the court has construed Plaintiffs' amended complaint as an action brought pursuant to § 1983 to vindicate their rights under the Constitution. Therefore, to the extent that Plaintiffs

seek an independent basis for recovery, Count V will be dismissed.

### 7. *Relief Sought*

 Finally, Defendants contend that the remainder of Plaintiffs' complaint must be dismissed because the court cannot grant the type of relief which Plaintiffs request. Specifically, Defendants rely upon *Growe v. Emison*, 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), for the proposition that the court is without power to create a new redistricting plan. That is, even if the court determines that Act 1 is unconstitutional, we must defer to the State legislature or judicial system to create a new plan. However, the court need not address that issue at this time. Plaintiffs request that the court grant a declaratory judgment that Act 1 violates the one person-one vote requirement of Article I. Clearly, the court has the remedial power to issue such a declaratory judgment.

### III. *Conclusion*

As to Defendant Executive Officers' motion to dismiss for lack of subject matter jurisdiction, the court will grant that motion in part and will deny it in part. The court will grant the motion as to Defendant Commonwealth of Pennsylvania, which will be dismissed from the suit on the basis of Eleventh Amendment sovereign immunity. The court, however, will deny the motion in all other respects. Because the court finds that Plaintiffs have standing to sue, the court will deny Defendant Presiding Officers' motion to dismiss for lack of subject matter jurisdiction. Additionally, as to the motions to dismiss for failure to state a claim, the court will grant both motions in part and deny both motions in part. The court holds that Plaintiffs have alleged a valid cause of action for violation of the one person-one vote requirement of Article I. Accordingly, the motions will be denied as to Count I of the amended complaint. However, the court will grant the motion as to Counts II, III, IV and V. An appropriate order will issue.