Sara LARIOS, et al., Plaintiffs,

v.

George E. "Sonny" PERDUE, et al., Defendants.

No. CIV.A. 1:03–CV–693–C.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 29, 2003.

Frank B. Strickland, Anne Ware Lewis, Strickland Brockington Lewis, Stacy Grant Freeman, Arnall, Golden & Gregory, Atlanta, GA, E. M. Braden, phv, Amy M. Henson, phv, Baker & Hostetler, Washington, DC, for Plaintiffs.

Dennis Robert Dunn, Thurbert E. Baker, Office of State Attorney General, Mark Howard Cohen, Troutman Sanders, David F. Walbert, Parks, Chesin & Walbert, Atlanta, GA, for Defendants.

Before MARCUS, Circuit Judge, O'KELLEY and PANNELL, District Judges.

**Memorandum Opinion and Order**

BY THE COURT.

This cause has come before this three judge district court pursuant to the follow-

ing motions: (1) Defendants Perdue, Coleman and Cox's Motion to Realign Defendant Eric Johnson as a Party Plaintiff; (2) Defendants Perdue, Coleman and Cox's Motion to Dismiss Complaint Against the Redistricting Plan for the Georgia State Senate or, in the Alternative, to Join a Party Pursuant to Fed.R.Civ.P. 12(b)(7); (3) Defendants Perdue, Coleman and Cox's Motion to Dismiss or Stay Consideration of Plaintiffs' Complaint Challenging Georgia's State Senate Redistricting Plan; and (4) Defendants Perdue, Coleman and Cox's Motion to Dismiss Plaintiffs' Claims Against the Redistricting Plans for Congress and the Georgia House of Representatives Pursuant to Fed.R.Civ.P. 12(b)(6).

After carefully considering these motions, plaintiffs' responses and defendants' replies, as well as the memoranda filed in response to our order dated July 3, 2003 and the contentions raised at oral argument, we grant defendants' motions to (1) realign defendant Eric Johnson as a party plaintiff; (2) stay consideration of plaintiffs' complaint challenging Georgia's 2002 State Senate Redistricting Plan; (3) dismiss plaintiffs' claim against the redistricting plans for Congress insofar as it is brought pursuant to 2 U.S.C. § 2c; and (4) dismiss plaintiffs' challenge to the combination of single- and multi-member districts in the 2001 House plan. By contrast, we deny defendants' Motion to Dismiss Complaint Against the Redistricting Plan for the Georgia State Senate or, in the Alternative, to Join a Party Pursuant to Fed.R.Civ.P. 12(b)(7). We also deny defendants' Motion to Dismiss Plaintiffs' Claims Against the Redistricting Plans for Congress and the Georgia House of Representatives Pursuant to Fed.R.Civ.P. 12(b)(6) insofar as it concerns plaintiffs' "one person one vote" challenges to these plans and their partisan gerrymandering claim.

In addition, we order defendants to answer plaintiffs' amended complaint within 10 days of the filing of this order. Further, we direct the parties to promptly notify this court of any ruling of the 3 judge panel of the United States District Court for the District of Columbia regarding the Voting Rights Act of 1965 ("VRA"), 42 U.S.C. § 1973c, preclearance issues in *Georgia v. Ashcroft.*

## I. Factual and Procedural Background

### A. The 2000 Census, the Redistricting Plans it Spurred and the Georgia v. Ashcroft Litigation

This case presents several challenges to Georgia's 2001 and 2002 legislative redistricting plans. More specifically, plaintiffs allege several constitutional and statutory shortcomings in Georgia's 2001 redistricting plan for Congress and the state House of Representatives, and its 2002 reapportionment plan for the state Senate. In order to understand the contours of these claims, it is necessary to briefly examine the events that led to the drafting of these plans.

As a result of the 2000 census, Georgia became entitled to two additional congressional seats, pursuant to 2 U.S.C. § 2a. Moreover, due to a population migration from the southern to the northern part of the state, by 2000 the number of people in the state House and Senate districts had become uneven. For both of these reasons, it was necessary for the Georgia General Assembly to devise a legislative reapportionment plan.

During August, 2001, the General Assembly met in special session to reapportion the Georgia State Senate and House of Representatives to equalize the population in each district, and it devised what we term the "2001 state Senate and House of Representatives (or House) plans." During a subsequent special legislative

session, the General Assembly formulated a reapportionment plan for Georgia's congressional seats (the "2001 congressional plan"). Both of the state plans and the federal reapportionment scheme were signed into law by the Governor of Georgia on October 1, 2001.

Importantly, however, Georgia is a jurisdiction covered by section 5 of the VRA, 42 U.S.C. § 1973c, and as such it was necessary to preclear the 2001 plans under the VRA. To this end, on October 10, 2001, the State of Georgia filed a declaratory judgment action in the United States District Court for the District of Columbia. Although a 3 judge panel of the district court (the "D.C. panel") precleared the 2001 state House of Representatives and congressional plans, the panel refused to preclear the 2001 state Senate redistricting plan. *See Georgia v. Ashcroft*, 195 F.Supp.2d 25, 31 (D.D.C.2002), *vacated by Georgia v. Ashcroft*, 539 U.S. 461, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003). In response, the Georgia General Assembly enacted a *new* Senate redistricting plan (the "2002 Senate plan"), which the Governor signed into law on April 11, 2002. The D.C. panel promptly precleared this plan under the VRA. *See Georgia v. Ashcroft*, 204 F.Supp.2d 4, 15–16 (D.D.C.2002). The 2002 Senate plan only applies unless and until the 2001 Senate plan is precleared under the VRA. Specifically, the General Assembly has expressly provided that "[i]f ... the [2001] special session Senate redistricting plan may lawfully be implemented under the [VRA] ... then qualifying for the Georgia State Senate in 2002 or such future year and the ensuing elections shall be conducted according to the [2001] special session Senate redistricting plan; and this Act shall not apply to such qualifying or elections or otherwise be of further force or effect." Act No. 444, 2002 Ga. Laws 148, 149.

Indeed, following the D.C. panel's refusal to preclear the 2001 Senate plan, the State of Georgia appealed this portion of the panel's order to the United States Supreme Court. On June 26, 2003, the Court vacated the D.C. panel's decision, holding that its initial preclearance inquiry was overly narrow. *See Georgia v. Ashcroft*, 539 U.S. 461, 123 S.Ct. 2498, 2517, 156 L.Ed.2d 428 (2003). However, the Court reserved the initial application of the broader inquiry it outlined for the panel on remand. *See id.* Although the case now rests with the D.C. panel once again, that panel has issued an order requiring the defendants to show cause why judgment should not be entered on behalf of the State of Georgia. In this order, the panel extensively cites passages from the Supreme Court's opinion suggesting that Georgia's 2001 redistricting plan may well be consistent with the VRA.

### B. Plaintiffs' Claims

Plaintiffs, who are Georgia Republicans, bring several claims against the 2001 congressional and state House plans and the 2002 state Senate plan. They name as defendants Republican Governor George E. "Sonny" Perdue; Terry Coleman, the Democratic Speaker of the Georgia House of Representatives; Eric B. Johnson, the Republican President Pro Tempore of the Georgia Senate; and Cathy Cox, Georgia's Democratic Secretary of State. In their amended complaint, plaintiffs advance four broad claims, sounding in: (1) a violation of their right to the equal protection of the laws based on (a) the underrepresentation of plaintiffs residing in overpopulated districts, (b) partisan gerrymandering, (c) the 2001 House plan's use of both single and multi-member districts and (d) the use of race as a predominant factor in the creation of the State Senate plan; (2) a violation of plaintiffs' First Amendment associational rights through the penalization of

Republican voters solely because of their party affiliation and political beliefs; (3) a violation of U.S. Const. art. I, § 2 based on the drawing of congressional districts so as to maximize the political advantage of the Democratic party; and (4) a violation of 2 U.S.C. § 2c based on Georgia's failure to create congressional "districts" at all.

Defendants Perdue, Coleman and Cox have responded to plaintiffs' complaint by filing several motions, including those now at issue.

## II. Discussion

### A. Defendants Perdue, Coleman and Cox's Motion to Realign Defendant Eric Johnson as a Party Plaintiff

Defendants argue that Senator Johnson's interests, both as a Republican generally and as evidenced by the positions he has taken in this litigation specifically, are identical to those of plaintiffs and are in diametric conflict with those of his co-defendants. Accordingly, they move to realign him as a party plaintiff.

Although realignment questions typically arise in the diversity of citizenship context, the need to realign a party whose interests are not adverse to those of his opponent(s) exists regardless of the basis for federal jurisdiction. *See, e.g., Development Fin. Corp. v. Alpha Hous., & Health Care,* 54 F.3d 156, 159 (3d Cir.1995) ("[W]e must consider a fundamental principle of federal jurisdiction, a principle associated with, but not limited to, diversity jurisprudence. In determining the alignment of the parties for jurisdictional purposes, the courts have a 'duty' to 'look beyond the pleadings and arrange the parties according to their sides in the dispute.'" (quoting *Indianapolis v. Chase Nat'l Bank,* 314 U.S. 63, 69, 62 S.Ct. 15, 17, 86 L.Ed. 47 (1941))); *Wade v. Mississippi Co-op. Extension Serv.,* 528 F.2d 508, 521–22 (5th Cir.1976) ("Although the cor-

rectness of a realignment of parties is an issue that normally arises only in the context of diversity jurisdiction cases, the principles applicable to those cases are equally so here [where federal jurisdiction is predicated on the existence of a federal question].").

The federal courts have used two primary tests in determining the propriety of realignment. *See generally United States Fid. & Guar. Co. v. A & S Mfg. Co., Inc.,* 48 F.3d 131, 132–33 (4th Cir.1995). Under the first, which has been labeled the "primary purpose test," "[i]f the interests of a party named as a defendant coincide with those of the plaintiff in relation to the [primary] purpose of the lawsuit, the named defendant must be realigned as a plaintiff ...." *United States Fid. and Guar. Co. v. Thomas Solvent Co.,* 955 F.2d 1085, 1089 (6th Cir.1992) (citing *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.,* 819 F.2d 1519, 1523 (9th Cir.1987)); *see also Employers Ins. of Wausau v. Crown Cork & Seal Co.,* 942 F.2d 862, 864–67 (3d Cir.1991) (applying the primary purpose test in a diversity case). The second has been deemed the "substantial controversy" or "collision of interests" test, and under this standard "courts require the existence of an actual, substantial controversy, or a collision of interests [if they are to deny realignment] but the conflict may in some cases concern an issue other than the so-called primary issue in dispute." *Maryland Cas. Co. v. W.R. Grace & Co.,* 23 F.3d 617, 622 (2d Cir.1993) (citing *Indianapolis,* 314 U.S. at 69, 62 S.Ct. at 17).

Notably, the Eleventh Circuit has applied the substantial controversy test in adjudicating a realignment motion in a diversity case. *See Weller v. Navigator Marine, Inc.,* 737 F.2d 1547, 1548 (11th Cir. 1984) ("In determining whether the district court properly denied Navigator's

motion for realignment and dismissal, we must 'determine whether there is an actual or substantial controversy between citizens of different states . . . .' " (quoting *Indemnity Ins. Co. of N. Am. v. First Nat'l Bank at Winter Park,* 351 F.2d 519, 522 (5th Cir.1965))).

Our circuit has not decided which standard applies where federal subject matter jurisdiction stems from the existence of a federal question. In one of the few circuit court cases to address this question, the Third Circuit has held that the propriety of realignment in federal question cases turns on the presence of a "substantial controversy." *Development Fin. Corp.,* 54 F.3d at 159; *see also In re Texas E. Transmission Corp.,* 15 F.3d 1230, 1240 (3d Cir.1994).

■ Regardless of which standard we apply, however, Senator Johnson should be a plaintiff in this case. As he conceded at oral argument, his pleadings and the positions he has taken in this case clearly are wholly consonant with those of the plaintiffs. In his answer he does not deny *any* of the substantive allegations in plaintiffs' complaint, and, indeed, he opposes his co-defendants' Motion to Dismiss the Complaint as Against the Redistricting Plan for the Georgia state Senate or, in the Alternative, to Join a Party Pursuant to Fed. R.Civ.P. 12(b)(7). Moreover, unlike his co-defendants, he supported the appointment of a 3 judge court in this case.

Additionally, a telling comparison can be made between Senator Johnson's answers to the questions this court posed in its July 3, 2003 order and those given by the other defendants in this case. As to the first question, whereas Senator Johnson says that the Supreme Court's decision in *Georgia v. Ashcroft* "should have little impact on the Court's consideration of this case,"

and thus that our consideration of plaintiffs' claims regarding the 2002 state Senate plan should continue, his co-defendants argue that plaintiffs' claims are "wholly undercut" by *Georgia v. Ashcroft,* and that as such we should stay our consideration of plaintiffs' claims regarding the 2002 state Senate plan. As for the third question,[1] Senator Johnson's response, distilled to its essence, is that the requirements for Article III standing to advance a partisan gerrymandering claim are "clearly alleged in the complaint." His co-defendants, by contrast, argue strenuously against standing. Finally, whereas Senator Johnson argues that plaintiffs have sufficiently alleged a partisan gerrymandering claim, his co-defendants contend that plaintiffs' partisan gerrymandering claim should be dismissed. Even Senator Johnson's view of the date by which this case will be trial-ready, "mid-October, 2003," is identical to the date suggested by plaintiffs, and dramatically differs from the "early 2004" trial proposed by defendants.

Simply put, Senator Johnson has taken—and undoubtedly will continue to take—precisely the same positions espoused by the plaintiffs in this case, and his interests, as reflected in those positions, are aligned with those of the plaintiffs and not with those of his co-defendants. Thus, under either the "substantial controversy" or "primary purpose" test, realignment plainly is appropriate.

Plaintiffs' response that, as an abstract matter, the need for realignment stems from the existence of "a statute requiring the interests of plaintiff and defendants to be adverse"—and thus that this concern is largely absent outside the diversity context—is unpersuasive. The need for adversity between plaintiffs and defendants stems not merely from the federal diversi-

---

1. Because our second question concerned only the redistricting plan for Georgia's House of Representatives, Senator Johnson did not answer it.

ty statute, 28 U.S.C. § 1332—or, for that matter, from any legislative enactment—but more fundamentally from U.S. Const. art. III. As the Supreme Court explained in *FEC v. Akins*, "Article III, of course, limits Congress' grant of judicial power to 'cases' or 'controversies.' That limitation means that ... courts will not 'pass upon ... abstract, intellectual problems,' but adjudicate 'concrete, living contest[s] *between* adversaries.'" 524 U.S. 11, 20, 118 S.Ct. 1777, 1784, 141 L.Ed.2d 10 (1998) (quoting *Coleman v. Miller*, 307 U.S. 433, 460, 59 S.Ct. 972, 985, 83 L.Ed. 1385 (1939) (Frankfurter, J., dissenting)) (emphasis added). It is for this reason that the need to assess the alignment of parties is equally strong in federal question cases like this one as it is in those premised on diversity jurisdiction.[2]

Accordingly, we grant Defendants Perdue, Coleman and Cox's Motion to Realign Defendant Eric Johnson as a Party Plaintiff.

*B. Defendants Perdue, Coleman, and Cox's Motion to Dismiss Complaint Against the Redistricting Plan for the Georgia State Senate or, in the Alternative, to Join a Party Pursuant to Fed.R.Civ.P. 12(b)(7)*

█ Defendants also argue that plaintiffs have improperly named Senator Johnson, the President Pro Tempore of the Georgia State Senate, as the legal representative of that legislative body because Georgia law provides that the Lieutenant Governor serves as the representative of the state Senate. Accordingly, they contend, the relief sought by plaintiffs cannot be granted if Lieutenant Governor Mark Taylor is not named as a party defendant.

They argue that under Fed.R.Civ.P. 19 either the Lieutenant Governor must be made a party to this action or plaintiffs' claims as to the 2002 state Senate plan must be dismissed.

Fed.R.Civ.P. 19(a) provides, in pertinent part, that "[a] person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties ...." Thus, in evaluating defendants' motion, the question we must ask is whether it is possible to afford plaintiffs the relief they seek in the absence of the Lieutenant Governor. As explained, defendants say that it is not possible.

The Georgia Constitution art. III, § 3, ¶ 1(a) plainly says that "[t]he presiding officer of the Senate shall be styled the President of the Senate." Ga. Const. art. III, § 3, ¶ 1(b), in turn, establishes that the President Pro Tempore of the Senate is the second in command of that body, saying specifically that "[t]he President Pro Tempore shall act as President in the case of the temporary disability of the President" and that if the President shall assume executive power (i.e., become the Governor) the President Pro Tempore shall become President." Ga. Const. art. V, § 1, ¶ 3 also provides that "[t]he Lieutenant Governor shall be the President of the Senate." Accordingly, in order to bind the Georgia Senate, defendants say, plaintiffs must name the Lieutenant Governor, its legal representative, as a party defendant.

---

2. As an aside, we note that in cases featuring only one defendant, the realignment of that party would destroy federal subject matter jurisdiction just as it would in a diversity case where realignment destroys complete diversi-

ty. Indeed, to frame this point in terms of the facts of this case, were Senator Johnson the sole defendant in the action, there would be no justiciable case or controversy here.

Plaintiffs' first response to defendants' motion is unconvincing. They say simply that the President Pro Tempore oversees the day-to-day business of the Georgia State Senate, and therefore he is the proper representative of the state Senate in this case. The problem with this position, however, is that to the extent plaintiffs wish to bind the Georgia State Senate, our inquiry is purely legal in nature; we must ascertain who can formally, legally bind the Senate, not who runs Senate matters day in and day out.

However, defendants argument presupposes that plaintiffs cannot be afforded complete relief without binding the Georgia State Senate. Not surprisingly, plaintiffs' second response to defendants' motion challenges this basic assumption. Specifically, plaintiffs say that the relief they seek

> is a declaration that the current Senate plan is unconstitutional, the imposition of an interim plan and, if necessary, an injunction to prohibit further use of the current Senate plan. Thus, the relief sought is primarily action by the Court and, if an injunction is necessary, then the Secretary of State is restrained from holding [or] qualifying ... elections. This Court can order all of that relief without Lieutenant Governor Taylor as a defendant in this case.

■ It is true that were we to grant plaintiffs the declarations they seek, we would leave them without valid redistricting plans. Therefore, someone would have to devise new ones. Plaintiffs say that they have asked the court to do so, and that accordingly there is no need for the legal representative of the state Senate to be made a party to this action. However, the Supreme Court "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt. When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan.'" *Wise v. Lipscomb*, 437 U.S. 535, 539–40, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). Accordingly, were we to find plaintiffs' claims in this case to be meritorious, concerns about comity and federalism would require us to give the Georgia legislature the first chance to rectify whatever constitutional deficiencies are found to exist in the plans.

Nonetheless, under the United States Supreme Court's anti-commandeering cases, we could not *require* Georgia's legislature to redraw new districts. *See Printz v. United States*, 521 U.S. 898, 912, 117 S.Ct. 2365, 2373, 138 L.Ed.2d 914 (1997) ("[S]tate legislatures are *not* subject to federal direction." (citing *New York v. United States*, 505 U.S. 144, 149, 112 S.Ct. 2408, 2414, 120 L.Ed.2d 120 (1992))) (emphasis in original). Instead, were we to require the drawing of new legislative districts, we could merely (and certainly would) afford the Georgia legislature the first *opportunity* to do so in a given time period, and were it to fail to act during this period we could then impose new districts by judicial order. *See, e.g., Growe v. Emison*, 507 U.S. 25, 36, 113 S.Ct. 1075, 1082, 122 L.Ed.2d 388 (1993) (noting the propriety of a district court setting a deadline for state legislative redistricting and acting on its own if this deadline goes unmet); *Vigil v. Lujan*, 191 F.Supp.2d 1273, 1274–75 (D.N.M.2001) (same); *Smith v. Beasley*, 946 F.Supp. 1174, 1212–13 (D.S.C.1996) ("[W]e will require that new districts for both the House and Senate be drawn during the next legislative session of the South Carolina General Assembly to remedy the unconstitutional districts.... If the legislature fails to pass a constitutional

redistricting plan, the court will discharge its unwelcome obligation to put its own remedial plan into effect.").

Because we cannot *require* the Georgia legislature to remedy any unconstitutional aspect of its redistricting plan, complete relief can be afforded by this court—whether by declaration or injunction, or by crafting a new plan—without the presence of the legal representative of the Georgia State Senate, i.e., without requiring the Lieutenant Governor to be joined in this suit. Indeed, when questioned as to this point at oral argument, defendants conceded that complete relief can be afforded to plaintiffs even in Lieutenant Governor Taylor's absence. Put differently, because we can enjoin the holding of elections pursuant to the 2002 plan (assuming, of course, that the plan is in fact unconstitutional) and subsequently require elections to be conducted pursuant to a constitutional apportionment system, the Lieutenant Governor is not a necessary party to this action. By contrast, the Georgia Secretary of State is a necessary party because she is designated by state law as being responsible for administering state-wide elections, and accordingly we cannot require that state-wide elections in Georgia be conducted using constitutional apportionment system in her absence.

Thus, the Rule 19 joinder of Lieutenant Governor Taylor—who, we note, has not moved to intervene in this case—is inappropriate. *See, e.g., Century Bus. Services, Inc. v. Bryant,* 69 Fed.Appx. 306, 311 (6th Cir.2003) ("A party is not 'necessary' where it has not claimed an interest in the outcome of an action and complete relief can be ordered in its absence." (citing *Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.,* 968 F.2d 1463, 1472 (1st Cir.1992))); *Peregrine Myanmar, Ltd. v. Segal,* 89 F.3d 41, 48 (2d Cir.1996) (" '[C]omplete relief' can be accorded even without the Ministry, because nothing in the district court's statements or final judgment requires the Ministry to do anything or change any of its positions." (quoting Fed.R.Civ.P. 19(a))); *Dickinson v. Ind. State Election Bd.,* 933 F.2d 497, 501 (7th Cir.1991) ("The federal court's remedial authority under Section Two [of the VRA] neither depends on nor necessarily impedes the state legislature's duty to reapportion. There is nothing inherent in a court's determination of liability under Section Two that requires the legislature's presence, even if the legislature has constitutional authority for apportionment."); *Central Del. Branch, NAACP v. City of Dover,* 110 F.R.D. 239, 241 (D.Del.1985) ("[W]hether or not the Delaware General Assembly approves any amendment to Dover's City Charter, the NAACP, if successful in this action, will be able to obtain 'complete relief,' namely, the holding of City Council elections in accordance with a constitutional plan.").

Significantly, nothing in our opinion prevents Lieutenant Governor Taylor from seeking to intervene in this case or precludes plaintiffs from seeking to join him in this action. We merely hold that because plaintiffs can be afforded complete relief without the presence of the Lieutenant Governor, he is not a "necessary" party, and that joinder under Fed.R.Civ.P. 19 consequently is inappropriate.

Therefore, we deny Defendants Perdue, Coleman and Cox's Motion to Dismiss Complaint Against the Redistricting Plan for the Georgia State Senate or, in the Alternative, to Join a Party Pursuant to Fed.R.Civ.P. 12(b)(7).

*C. Defendants Perdue, Coleman and Cox's Motion to Dismiss or Stay Consideration of Plaintiffs' Complaint Challenging Georgia's State Senate Redistricting Plan*

Defendants argue that because the D.C. panel in *Georgia v. Ashcroft* is likely

to preclear the 2001 Senate redistricting plan, we should dismiss plaintiffs' complaint with respect to the 2002 Senate plan, or at least stay consideration of plaintiffs' challenges to that plan pending a decision from the panel. They suggest that the issues surrounding the 2002 Senate plan probably will soon become moot, and that plaintiffs really seek nothing more than an advisory opinion from this court.

To reiterate, the State of Georgia's request for a declaratory judgment preclearing the Senate reapportionment plan under section 5 of the VRA initially was denied by the D.C. panel. *See Georgia v. Ashcroft,* 195 F.Supp.2d at 31. However, the panel's order subsequently was vacated by the United States Supreme Court, which remanded the case for further consideration in light of its ruling. *See Georgia v. Ashcroft,* 539 U.S. at ——, 123 S.Ct. at 2517 (holding that the panel's initial preclearance inquiry was overly narrow, but reserving the initial application of the broader inquiry it outlined for the panel on remand). In vacating the D.C. panel's order, the Supreme Court strongly suggested—but did not decide—that preclearance of the 2001 state Senate plan was appropriate. It said:

> Given the evidence submitted in this case, we find that Georgia likely met its burden of showing nonretrogression. The increase in black voting age population in the other districts likely offsets any marginal decrease in the black voting age population in the three districts that the District Court found retrogressive. Using the overlay of the 2000 census numbers, Georgia's strategy of "unpacking" minority voters in some districts to create more influence and coalitional districts is apparent. Under the 2000 census numbers, the number of majority black voting age population districts in the new plan increases by one, the number of districts with a black voting age population of between 30% and 50% increases by two, and the number of districts with a black voting age population of between 25% and 30% increases by another 2.

539 U.S. at ——, 123 S.Ct. at 2515. Notably, as explained *supra,* on remand the D.C. panel cited this and similar language in the Supreme Court's opinion in issuing an order requiring the defendants in that case to show cause why judgment should not be entered in favor of the State of Georgia, i.e., preclearing the 2001 state Senate reapportionment plan.

Defendants' argument, distilled to its essence, is straightforward. They say that if the 2001 state Senate plan is precleared, the 2002 state Senate plan will cease to be effective, thereby rendering plaintiffs' claims with respect to that plan moot. Accordingly, they say that we should, at a minimum, stay our consideration of those claims pending a decision from the D.C. panel. Plaintiffs respond by arguing that (1) the VRA issues before the Supreme Court are materially different from the "one person one vote" and First Amendment claims presently at bar; and (2) even if the Supreme Court does pre-clear the 2001 plan, that plan features the same deficiencies as the 2002 plan, and accordingly there is no reason to defer consideration of their claims.

We agree with defendants. Plaintiffs' first argument misses the mark. Although the VRA issues presently before the D.C. panel are substantively different from those now before this court, the potential for the D.C. panel's ruling to render wholly ineffectual the 2002 state Senate redistricting plan—and likewise negate plaintiffs' claims respecting that plan—are

unaffected by this difference. Moreover, contrary to plaintiffs' second argument, it is untenable to say that because the same problems inhere in the 2001 plan as allegedly taint the 2002 plan we should nonetheless proceed with our consideration of the constitutionality of the 2002 state Senate redistricting plan. Indeed, as plaintiffs themselves concede, the population deviations in the 2001 and 2002 Senate plans are different; the 2002 plan was enacted in response to the D.C. panel's invalidation of the 2001 plan, albeit on different grounds, and as such features real alterations in the drawing of district boundaries. (In fact, during oral argument the parties agreed that at least some of the district boundaries differ materially between the 2001 and 2002 Senate plans.)

Simply stated, defendants are correct both that if the 2001 Senate plan ultimately is precleared it will moot plaintiffs' claims with respect to the 2002 plan, and that it does indeed seem reasonably likely that the D.C. panel will preclear the 2001 plan. Accordingly, we think the wisest course is to stay for now *judicial resolution* of plaintiffs' claims with respect to the 2002 Senate plan. *See generally Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n. 6, 118 S.Ct. 1761, 1769 n. 6, 140 L.Ed.2d 1070 (1998) (" '[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.' " (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936))); *Stone v. INS*, 514 U.S. 386, 411, 115 S.Ct. 1537, 1552, 131 L.Ed.2d 465 (1995) (Breyer, J., dissenting) ("[W]e have

long recognized that courts have inherent power to stay proceedings ....") (citation omitted). Of course, we are not staying judicial resolution of plaintiffs' claims with respect to the 2001 state House of Representatives and congressional reapportionment plans.

Importantly, however, we do not stay *discovery* on plaintiffs' claims regarding the 2002 state Senate plan because time is short in this case and because those claims are very similar to plaintiffs' challenges to the 2001 House and congressional plans.

Additionally, because the need for an expeditious ruling on the merits of plaintiffs' claims is compelling, we direct defendants to answer within 10 days of the filing of this order plaintiffs' amended complaint, including plaintiffs' allegations regarding the 2002 Senate plan. Moreover, we direct the parties to promptly notify this court of any ruling of the D.C. panel regarding the VRA preclearance issues in *Georgia v. Ashcroft*.

In short, although we stay for now judicial resolution of plaintiffs' claims respecting the 2002 state Senate plan, we do not permanently deny plaintiffs review of their challenges to the Senate plan, whether the 2001 or 2002 variety. Instead, we merely postpone consideration of the 2002 state Senate plan until we can be certain that the particular plan we evaluate is the one that ultimately will be afforded legal effect. Otherwise we would face the very real prospect of issuing an advisory opinion about a plan no longer extant. *See generally Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir.2001) ("If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed.") (citation omitted).

D. *Defendants Perdue, Coleman and Cox's Motion to Dismiss Plaintiffs' Claims Against the Redistricting Plans for Congress and the Georgia House of Representatives Pursuant to Fed.R.Civ.P. 12(b)(6)*

1. *Defendants' Motion to Dismiss Plaintiffs' "One Person One Vote" Challenge to the 2001 State House of Representatives Reapportionment Plan*

■ Plaintiffs claim that the population deviations among the districts created by the 2001 House plan violate the "one person one vote" principle, and thus the Equal Protection Clause of the Fourteenth Amendment. Defendants move to dismiss this claim on the ground that the 10% maximum population deviation threshold set forth in *Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983), is not crossed here.[3] More specifically, in *Gaffney v. Cummings,* the Supreme Court observed that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a *prima facie* case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." 412 U.S. 735, 745, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973). In *Brown,* the Court reiterated this point in more precise terms, holding that "an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a *prima facie* case of discrimination and therefore must be justified by the State." 462 U.S. at 842–43, 103 S.Ct. at 2696. In arguing that we should dismiss plaintiffs' "one person one vote" challenge to the 2001 House plan, defendants posit that the 10% threshold

set forth in *Brown* does not merely serve to allocate the burden of proof with respect to the constitutionality of the reapportionment plan in question. Rather, they contend that any plan with a maximum population deviation that is less than 10% is completely immune from a "one person one vote" challenge.

Plaintiffs respond by citing the Fourth Circuit's explicit rejection of this very argument in *Daly v. Hunt.* That court said:

> The 10% *de minimis* threshold recognized in *Brown* does not completely insulate a state's districting plan from attack of any type. Instead, that level serves as the determining point for allocating the burden of proof in a one person, one vote case. A maximum deviation of greater than 10% automatically establishes a *prima facie* violation of the one person, one vote principle. If the plaintiff establishes this level of disparity in population among the districts, the burden of proof shifts to the state to justify the deviations by showing a rational and legitimate state policy for the districts. On the other hand, if the maximum deviation is less than 10%, the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness. To survive summary judgment, the plaintiff would have to produce further evidence to show that the apportionment process had a "taint of arbitrariness or discrimination."

93 F.3d 1212, 1220 (4th Cir.1996) (quoting *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964)).

■ We believe the Fourth Circuit is correct. *See Cecere v. County of Nassau,* 258 F.Supp.2d 184, 189–90 (E.D.N.Y.2003)

---

3. In particular, plaintiffs allege that the maximum positive deviation in the House districts is 4.99% over ideal, while the maximum negative deviation is –4.99%, for an overall maximum population deviation of 9.98%. Moreover, we note that there are 17 (out of 147) districts with a deviation of at least + or—4.90.

(expressly adopting the *Daly* court's view of the significance of the 10% threshold (citing *Daly*, 93 F.3d at 1220)); *Montiel v. Davis*, 215 F.Supp.2d 1279, 1286 (S.D.Ala. 2002) (same). Put simply, the law is this: If the maximum population deviation is 10% or over, a *prima facie*—that is, rebuttable—presumption of a Fourteenth Amendment violation has been established. The burden lies with defendants to establish that the districts are the product of a rational, legitimate state policy. By contrast, if the maximum deviation is less then 10%, a *prima facie*—that is, rebuttable—presumption that the reapportionment plan in question *is* constitutional has been established. The onus lies with plaintiffs to establish the unconstitutionality of the plan. Importantly, the very fact that this threshold is not met in a particular case is not, standing alone, a viable basis for dismissal.[4]

Notably, the court's decision in *Holloway v. Hechler*, 817 F.Supp. 617 (S.D.W.Va.1992), on which defendants rely, does not conflict with the explication of *Brown's* 10% threshold set forth in *Daly*. Quite the contrary, the *Holloway* court merely confirms that a maximum population deviation of 9.97% "does not *prima facie* establish [the redistricting plan] to be unconstitutional ..." *Id.* at 623. Indeed, it does not. However, contrary to defen-

dants' argument, neither does it bar the possible success of a "one person one vote" claim. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) ("In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no* set of facts in support of his claim which would entitle him to relief.") (emphasis added). Accordingly, we deny defendants' motion to dismiss plaintiffs' "one person one vote" claims as to the state House of Representatives.

*2. Defendants' Motion to Dismiss Plaintiffs' "One Person One Vote" Challenge to Congressional Reapportionment Plan*

Similar to their claim regarding the 2001 House plan, plaintiffs advance a "one person one vote" challenge to the constitutionality of the 2001 congressional plan, arguing that it creates population deviations among Georgia's 13 congressional districts.[5] Plaintiffs contend that under controlling Supreme Court precedent, the population of each congressional district within a state must be as close as practicable to *absolutely* equal, and that because this standard is unmet by the 2001

---

**4.** Although plaintiffs, citing *Brown*, argue that we should round up the maximum population deviation in the House plan from 9.98% to 10%, both earlier Supreme Court caselaw and subsequent decisions from other courts have not rounded the maximum deviation. *See, e.g., White v. Regester*, 412 U.S. 755, 763, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973) (not rounding up a maximum population deviation of 9.9%); *Montiel*, 215 F.Supp.2d at 1282 (not rounding up maximum population deviations of 9.78% and 9.93%); *Holloway*, 817 F.Supp. at 623 (not rounding up a maximum population deviation of 9.97%). Consistent with the approach taken by these courts, we will not round up the maximum population deviation

created by the 2001 House plan, and the burden rests with plaintiffs to establish the unconstitutionality of that plan.

**5.** Specifically, the 2001 congressional plan, which features an ideal population of 629,727 persons per district, creates deviations ranging from +35 people in district 9 to –37 people in district 4, for a maximum or overall population deviation of 72 people. *See, e.g., Abrams v. Johnson*, 521 U.S. 74, 98, 117 S.Ct. 1925, 1939, 138 L.Ed.2d 285 (1997) ("Overall [or maximum] population deviation is the difference in population between the two districts with the greatest disparity.").

congressional plan, that plan violates U.S. Const. art. I, § 2.

Defendants argue that the deviations identified by plaintiffs are so *de minimis* that they are not actionable. Indeed, defendants note that to achieve perfect population equality, district lines would have to be drawn through apartment complexes and other residential communities. Their argument, in essence, is that the deviations created by the 2001 congressional plan are so small as to render plaintiffs' claim farfetched. Plaintiffs respond by reiterating that the goal in congressional apportionment is absolute numerical equality, and that *any* deviation from this ideal, no matter how small, must be justified by the state apportioning body.

At this stage in the proceedings, plaintiffs have the better of the argument. In *Karcher v. Daggett*, the Supreme Court held:

> Article I, § 2 establishes a "high standard of justice and common sense" for the apportionment of congressional districts: "equal representation for equal numbers of people." *Wesberry v. Sanders*, 376 U.S. 1, 18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Precise mathematical equality however, may be impossible to achieve in an imperfect world; therefore the "equal representation" standard is enforced only to the extent of requiring that districts be apportioned to achieve population equality "as nearly as is practicable." *See id.*, 376 U.S. at 7–8, 84 S.Ct. 526. As we explained further in *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) ... "[T]he 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality. *See Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362,

12 L.Ed.2d 506 (1964). Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small," 394 U.S. at 530–531, 89 S.Ct. 1225. Article I, § 2, therefore, "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Id.* at 531, 89 S.Ct. 1225. *Accord White v. Weiser*, 412 U.S. at 790, 93 S.Ct. 2348.

462 U.S. 725, 730, 103 S.Ct. 2653, 2658, 77 L.Ed.2d 133 (1983); *see also Abrams v. Johnson*, 521 U.S. 74, 98, 117 S.Ct. 1925, 1939, 138 L.Ed.2d 285 (1997) ("[C]ourts should keep in mind that 'absolute population equality [is] the paramount objective.'" (quoting *Karcher*, 462 U.S. at 732, 103 S.Ct. at 2659)). Accordingly, to the extent that the 2001 congressional plan does not achieve the "absolute equality" to which *Karcher* refers—and it plainly does not, although the variances at issue are exceedingly minute,[6] *see generally Abrams*, 521 U.S. at 100, 117 S.Ct. at 1940 (referring to a plan with average population deviations of .11% and an "overall" or maximum deviation of .35% as "slight")— the burden rests with defendants to demonstrate the unavoidability of these variances or to otherwise justify them. Again, this is not the stuff of a Rule 12(b)(6) dismissal, and accordingly we deny defendants' motion. *See Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102 ("In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no* set of facts

---

6. Indeed, the maximum population deviation is approximately .0001%, a figure that is derived by dividing the maximum deviation, 72 persons, by the ideal population of Georgia's congressional districts, 629,727 persons.

in support of his claim which would entitle him to relief.") (emphasis added).

3. *Defendants' Motion to Dismiss Plaintiffs' Partisan Gerrymandering Claims Pursuant to Fed.R.Civ.P. 12(b)(6)*

At the outset, we note that defendants argue in their supplemental memorandum that plaintiffs have not raised a separate political gerrymandering claim. We are unpersuaded. Plaintiffs unquestionably raise a distinct partisan gerrymandering claim. *See* Complaint ¶ 97; *see also* Amended Complaint at ¶¶ 92, 97. The fact that this claim is not grouped separately from plaintiffs' "one person one vote" claims is of no moment, as these simply are two species of a Fourteenth Amendment claim.

As for the merits of the motion to dismiss, defendants argue that plaintiffs' partisan gerrymandering claim is frivolous, since the majority of Georgia's federal congressional delegation (8 out of 13) and state Senate (30 of 56) are Republican, and the Governor is a Republican as well. Further, defendants explicitly question whether political discrimination in redistricting even states a claim, and whether *Davis v. Bandemer,* 478 U.S. 109, 143, 106 S.Ct. 2797, 2816, 92 L.Ed.2d 85 (1986), the case in which the Supreme Court first recognized such a claim, retains any vitality. In support of their contention that *Davis* no longer is binding, defendants note that Justice Stevens is the only member of the *Davis* majority remaining on the Court and that both Chief Justice Rehnquist and Justice O'Connor dissented in that case.

■ Since *Davis* never has been overruled by the Supreme Court, we are bound to follow it. *See generally United States v. Thomas,* 242 F.3d 1028, 1035 (11th Cir.), *cert. denied,* 533 U.S. 960, 121 S.Ct. 2616, 150 L.Ed.2d 770 (2001) ("[W]e cannot overrule Supreme Court decisions ... As we explained in *United States v. Guadamuz–Solis,* 232 F.3d 1363 (11th Cir.2000), we are bound to follow [a particular Supreme Court precedent] unless and until the Supreme Court itself overrules that decision."). The *Davis* plurality specifically held that to prevail on a partisan gerrymandering claim the plaintiff must prove (1) intentional discrimination (2) against an identifiable political group *and* (3) an actual discriminatory effect on that group. *See* 478 U.S. at 127, 106 S.Ct. at 2808. Although a plaintiff may satisfy the first two elements fairly easily, *see generally O'Lear v. Miller,* 222 F.Supp.2d 850, 855 (E.D.Mich.), *aff'd* 537 U.S. 997, 123 S.Ct. 512, 154 L.Ed.2d 391 (2002); *Vieth v. Pennsylvania,* 188 F.Supp.2d 532, 543–44 (M.D.Pa.2002), it is far more difficult to establish an actual discriminatory effect. To do so, "the under-represented political group must also show that 'the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole.'" *O'Lear,* 222 F.Supp.2d at 855 (quoting *Davis,* 478 U.S. at 132, 106 S.Ct. at 2810). As the 3 judge panel explained in *O'Lear,* "[f]or majority party plaintiffs ... this means 'a finding of unconstitutionality must be supported by evidence of continued frustration of the will of a majority of the voters.'" *Id.* at 855–56 (quoting *Davis,* 478 U.S. at 133, 106 S.Ct. at 2810–11). Indeed, the essence of the harm addressed by the political gerrymandering claim is the exclusion of the members of a given political party from the political *process.* Thus, it is not just that a redistricting effort may disfavor a particular political party or group that renders it unconstitutional, but rather the Constitution is offended only by redistricting measures that prevent the disfavored party from remedying its unfair treatment through the democratic process.

■ Defendants argue that plaintiffs have not (and cannot) allege a case of discriminatory political impact. They note that several other courts have dismissed partisan gerrymandering claims for failure to show such an impact. *See, e.g., O'Lear,* 222 F.Supp.2d at 858 (reasoning that the plaintiffs had not "alleged (1) that they have no chance of obtaining more favorable congressional districts in the next reapportionment; (2) that Republican candidates would be indifferent to the interests of Democratic citizens; or (3) that the challenged plan would result in Democrats being essentially 'shut out' of the political process"); *Duckworth,* 213 F.Supp.2d at 557 (reasoning that despite Maryland's heavy concentration of Democratic voters 4 of its 8 congressional representatives were Republican).

In their supplemental memorandum, however, plaintiffs say that their complaint in fact alleges an "actual discriminatory effect" of the type described in *Davis.* After reading both plaintiffs' complaint and their response to our question regarding this specific point, we are satisfied that they may proceed with this claim, given the liberal standard set forth in Fed. R.Civ.P. 8(a). In their complaint, plaintiffs allege that the dilution they are suffering "will be exacerbated throughout the decade." Complaint ¶ 75 ("The systematic and intentional overpopulating of the state legislative districts in northern Georgia and underpopulating of the districts in urban Fulton County, DeKalb County and southern Georgia, constitutes intentional and invidious discrimination against the voters of northern Georgia ... Because of growth patterns, this dilution will be exac-

erbated through the decade ...."). This is analogous to an allegation "of continued frustration of the will of a majority of the voters" *Davis,* 478 U.S. at 133, 106 S.Ct. at 2811. Plaintiffs also refer to the harm they suffer as a result of the Democrats' political gerrymandering as being "irreparable," Complaint ¶ 98 ("There is no adequate remedy at law for the irreparable harm Plaintiffs suffer ... through continued use of the current Congressional and state legislative redistricting plans."), which also implies that it cannot be remedied by the political process.[7]

Although plaintiffs therefore survive defendants' motion to dismiss under Rule 12(b)(6), we reiterate that this claim will be difficult to sustain, as plaintiffs must make the extremely onerous showing that Georgia's legislative apportionment plans arrange "the electoral system ... in a manner that will consistently degrade [their] influence on the political process as a whole." *Davis,* 478 U.S. at 132, 106 S.Ct. at 2810. This showing has alternatively been characterized as a showing that the plaintiffs have been "unconstitutionally denied [their] chance to effectively influence the political process," *id.* at 132–33, 106 S.Ct. at 2810, or have been "essentially shut out of the political process." *Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F.Supp. 1022, 1040 (D.Md. 1994) (quoting *Davis,* 478 U.S. at 139, 106 S.Ct. at 2814). Regardless of the particular formulation we employ, under the law, to substantiate a partisan gerrymandering claim is a tall order indeed.

Nonetheless, at this stage, we deny defendants' motion to dismiss this claim pur-

---

7. We frame this analysis in terms of plaintiffs' original complaint. We note, however, that plaintiffs have filed an amended complaint which is the subject of a motion to dismiss by defendants. The amended complaint features precisely the same allegations, and accordingly the partisan gerrymandering claim survives defendants' dismissal motion regardless of which incarnation of the complaint we consider. We express no view as to the merits of defendants' motion to dismiss plaintiffs' amended complaint, which is not ripe for our consideration today.

suant to Fed.R.Civ.P. 12(b)(6). *See Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102 ("In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no* set of facts in support of his claim which would entitle him to relief.") (emphasis added).

*4. Defendants' Motion to Dismiss Plaintiffs' Challenge to the 2001 Congressional Plan Pursuant to 2 U.S.C. § 2c*

Plaintiffs also claim that the "districts" created by the 2001 congressional plan are not truly "districts" within any conceivable meaning of that term, and that accordingly the plan runs afoul of 2 U.S.C. § 2c.[8] Defendants argue in response that § 2c merely requires that congressional districts be single-member, and nothing more. *See Branch v. Smith*, 538 U.S. 254, 123 S.Ct. 1429, 1438, 155 L.Ed.2d 407 (2003) ("[Section] 2c tells the legislatures what to do (single-member districting)"). Plaintiffs do not allege that Georgia's congressional districts—as opposed to those for its state House of Representatives—are multi-member, and as such, defendants say, their claim cannot succeed.

Plaintiffs' claim that "the current torturously-shaped land masses that Georgia calls 'districts' are not truly 'districts,' as used by Congress in § 2c" draws in significant part from the Supreme Court's recognition in racial gerrymandering cases that "reapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid." *Shaw v. Reno*, 509 U.S. 630, 647, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

■ However, even assuming that the analytical modality applied in *Shaw* is applicable outside the context of equal protection challenges to *racial* gerrymandering (and the strict scrutiny that is applied in such cases), no reasonable argument can be made that § 2c contains *any* "geographic compactness" requirement. Taken on its face, this section requires single-member congressional districts, nothing less and, as defendants emphatically note, nothing more. No case of which we are aware ever has held otherwise. Although plaintiffs argue that their contention is *not* that § 2c requires that election districts be geographically compact (indeed, they concede that § 2c imposes no such requirement), but rather that the "districts" created by the 2001 plan "do not resemble any reasonable definition of that word," we can perceive no meaningful difference between these contentions. Plaintiffs' only basis for arguing that the districts created by the 2001 congressional plan do not resemble "districts" is that they are sprawling and oddly-shaped, i.e., are not geographically compact. Although the shape of the 2001 congressional plan's districts may

---

**8.** This section provides:

In each State entitled in the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provisions of section 2a(a) of this title, there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative (except that a State which is entitled to more than one Representative and which has in all previous elections elected its Representatives at Large may elect its Representatives at Large to the Ninetyfirst Congress).

2 U.S.C. § 2c.

bear on the General Assembly's intent in creating them, it does not, standing alone, provide a basis for a claim under 2 U.S.C. § 2c. Accordingly, "plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief" under § 2c, *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102, and we grant defendants' motion to dismiss their claim under this section.

### 5. Defendants' Motion to Dismiss Plaintiffs' Equal Protection Challenge to the Constitutionality of Georgia's Multi–Member House of Representatives Districts

 Plaintiffs argue further that the combination of single- and multi-member districts in the 2001 House plan violates the "one person one vote" principle, and thus the Equal Protection Clause of the Fourteenth Amendment. Defendants also move to dismiss this claim, arguing that the Supreme Court repeatedly has held that the mere fact that single- and multi-member districts are created by the same legislative apportionment plan does not amount to a constitutional violation. *See, e.g., Fortson v. Dorsey*, 379 U.S. 433, 436, 85 S.Ct. 498, 500, 13 L.Ed.2d 401 (1965) ("Only last Term, in our opinion in *Reynolds v. Sims*, ... we rejected the notion that equal protection necessarily requires the formation of single-member districts. In discussing the impact on bicameralism of the equal-protection standards, we said, 'One body could be composed of single-member districts while the other could have at least some multimember districts.'" (quoting *Reynolds*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964))).

Plaintiffs respond by citing *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377, 380–81 (2002), where the North Carolina Supreme Court held that the use of both single- and multi-member districts in the same redistricting plan violates the Equal Protection Clause of the North Carolina Constitution unless the state advances a compelling state interest justifying the inclusion of multi-member districts, and *Kruidenier v. McCulloch*, 258 Iowa 1121, 142 N.W.2d 355, 375 (Iowa 1966), where the Iowa Supreme Court held similarly under both the Iowa and federal Constitutions.

In our order of July 3, 2003, we asked the parties whether plaintiffs allege that the mere fact that multi-member districts are combined with single-member districts in Georgia is unconstitutional or that the particular combination established by the 2001 state House redistricting plan is somehow unconstitutional. Plaintiffs' response, in essence, is "both." As for the former, they say: "Plaintiffs agree that their Complaint asserts a claim, under the Equal Protection Clause, that voters in single member districts have less representation than those residing in [multimember] districts and that, of itself, is a constitutional violation under *Reynolds v. Sims* ...." Plaintiffs' Supplemental Memo. at 14. The simple response to this claim, however, is that the Supreme Court has explicitly rejected this argument. *See White v. Regester*, 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973) ("Plainly, under our cases, multimember districts are not per se unconstitutional, nor are they necessarily unconstitutional when used in combination with single-member districts in other parts of the State.") (citations omitted). Instead, the constitutionality of multi-member districts—whether used exclusively or in combination with single-member districts—turns on whether the "one person one vote" principle (or the prohibition against partisan gerrymandering) is violated. Accordingly, to the extent the complaint alleges that the mere co-existence of single- and multi-member districts in the 2001 House plan is unconstitutional, plaintiffs' claim is dismissed pursuant to Fed. R.Civ.P. 12(b)(6).

As for plaintiffs' challenge to the particular combination established by the 2001 House plan, plaintiffs conceded at oral argument that their claim is really that these districts violate the "one person one vote principle." In other words, this claim seems to us to be a recast "one person one vote" challenge, nothing more, nothing less. Thus, to the extent plaintiffs are attempting to allege an independently justiciable claim, somehow grounded in the single- and multi-member districts created by the 2001 House plan, we think this "claim" is fully encompassed within their "one person one vote" challenge to the 2001 House plan, and cannot be pled separately.

Notably, plaintiffs' proofs concerning the General Assembly's intent in creating the 2001 House plan's multi-member districts, as well as any discriminatory effect of those districts, may well be of evidentiary significance in the context of plaintiffs' remaining claims. We merely hold that plaintiffs do not assert any independently justiciable claim sounding in the creation or nature of those districts.

*6. Defendants' Argument that Plaintiffs Lack Standing to Challenge the Apportionment of any District Except that in Which they Actually Reside*

Finally, defendants argue that plaintiffs lack standing under U.S. Const. art. III, § 2 to challenge the apportionment of any of the districts except those in which they actually reside.

In *United States v. Hays*, a racial gerrymandering case, the Supreme Court observed that "[w]here a plaintiff resides in a racially gerrymandered district ... the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." 515 U.S. 737, 744–45, 115 S.Ct. 2431, 2436, 132 L.Ed.2d 635 (1995); *see also Bush v. Vera*, 517 U.S. 952, 958, 116 S.Ct. 1941, 1951, 135 L.Ed.2d 248 (1996) (recognizing the standing principle set forth in *Hays* ); *Shaw v. Hunt*, 517 U.S. 899, 904, 116 S.Ct. 1894, 1900, 135 L.Ed.2d 207 (1996) ("a plaintiff who resides in a district which is the subject of a racial-gerrymander claim has standing to challenge the legislation which created that district") (citation omitted); *Dillard v. Baldwin County Comm'rs*, 225 F.3d 1271, 1279 (11th Cir.2000) (recognizing the standing principle set forth in *Hays* ) (citation omitted). Similarly, in *Fairley v. Patterson*, the old Fifth Circuit held that "[u]nder appellants' first claim, a traditional one man, one vote argument, the Supreme Court has conclusively established in *Baker v. Carr* ... and *Reynolds v. Sims* ... that sufficient damage through underrepresentation to obtain standing will be inflicted if population equality among voting units is not present. *However, injury results only to those persons domiciled in the under-represented voting districts*." 493 F.2d 598, 603–04 (5th Cir. 1974) (emphasis added).

■■■ Accordingly, to possess standing to challenge on any grounds a legislative apportionment plan, a plaintiff must reside in an underrepresented district. Importantly, however, any underrepresented plaintiff may challenge *in its entirety* the redistricting plan that generated his harm. As the Supreme Court observed in *Hays*:

Appellees insist that they challenged Act 1 *in its entirety*, not District 4 in isolation.... That is true. It is also irrelevant. The fact that Act 1 *affects* all Louisiana voters by classifying each of them as a member of a particular congressional district does not mean—even if Act 1 inflicts race-based injury on *some* Louisiana voters—that *every* Louisiana voter has standing to challenge Act 1 as a racial classification. Only those citizens able to allege injury as a

direct result of having *personally* been denied equal treatment ... may bring such a challenge, and citizens who do so carry the burden of proving their standing, as well as their case on the merits. 515 U.S. at 746, 115 S.Ct. at 2437 (citation and internal punctuation omitted) (emphasis partially added); *see also Shaw*, 517 U.S. at 904, 116 S.Ct. at 1900 ("a plaintiff who resides in a district which is the subject of a racial-gerrymander claim has standing to challenge the legislation which created that district") (citation omitted). As *Hays* and *Shaw* thus make clear, any plaintiff who has personally been denied equal treatment, i.e., lives in an underrepresented district, has standing to challenge the entire legislative apportionment scheme that produced his harm.[9]

Indeed, any contrary holding would make no sense as a practical matter. Because each legislative district borders at least one other district, the alteration of a district's boundaries necessarily affects the contours of the other districts as well. For example, 22 of the 30 individual plaintiffs in this case allegedly live in underrepresented state House districts. These 22 districts are scattered throughout the state, and as such their alteration will likely affect, chain reaction-style, the borders of nearly every (if not every) other district in Georgia. As the Supreme Court observed in *Abrams*, a case in which "2 of 11 [congressional] districts [in Georgia] were found to unconstitutional, on opposite sides of the State," "any remedy of necessity must affect almost every district." 521 U.S. at 86, 117 S.Ct. at 1933.

In this case, there is little question that each individual plaintiff lives in at least one underrepresented district, whether it is a congressional, state Senate or state House district.[10] Accordingly, each

9. This is so regardless of whether the underrepresentated plaintiff's district is single- or multi-member; to the extent that the plaintiff lives in a multi-member district, he simply must demonstrate that his district is overpopulated (and thus under-represented), i.e., that, for example, a "4 member" multi-member district has more than 4 times the population of an ideal single-member district.

10. In particular, plaintiff Sara Larios allegedly lives in state Senate district 17, which has a population deviation of 4.97%; plaintiff Whit Ayres lives in state Senate district 56, which has a population deviation of 4.97%, and state House district 40, which has a population deviation of 4.17%; plaintiff Ann Balfour lives in state Senate district 09, which has a population deviation of 4.98%, and state House district 70, which has a population deviation of 3.05%; plaintiff Georgia Benton lives in congressional district 12, which has a population deviation of +8 people, and state House district 123, which has a population deviation of 4.98%; plaintiff Pam Bohannon lives in congressional district 1, which has a population deviation of +34 people, state Senate district 16, which has a population deviation of 4.97%, and state House district 117, which has a population deviation of 4.99%; plaintiff

Merri Brantley lives in state Senate district 48, which has a population deviation of 4.79%, and state House district 64, which has a population deviation of 2.91%; plaintiff Joey Brush lives in congressional district 9, which has a population deviation of +35 people, and state Senate district 24, which has a population deviation of 4.25%; plaintiff Craig Burnsed lives in state Senate district 30, which has a population deviation of 4.91%, and state House district 26, which has a population deviation of 4.97%; plaintiff Bob Clarke lives in state Senate district 53, which has a population deviation of 4.97%; plaintiffs Ashlene Corr and Donald Corr live in state Senate district 28, which has a population deviation of 4.97%, and state House district 87, which has a population deviation of 4.93%; plaintiff Robert F. Dallas lives in state Senate district 42, which has a population deviation of 4.64%, and state House district 52, which has a population deviation of 2.00%; plaintiff Reta Dodd lives in congressional district 13, which has a population deviation of +5 people, and state Senate district 44, which has a population deviation of 2.09%; plaintiff P. Martin Ellard lives in state Senate district 49, which has a population deviation of 4.61%, and state House district

plaintiff can challenge the redistricting plan that created his or her district.

As the Eleventh Circuit recently explained in *National Parks Conservation Ass'n v. Norton*:

> In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), the Supreme Court set forth the test for Article III standing. First, the plaintiff must have suffered an "injury in fact," or "an invasion of a legally protected interest which is ... concrete and particularized." *Id.* at 560, 112 S.Ct. at 2136. Second, the plaintiff must demonstrate the existence of a causal connection between the injury and the conduct complained of, *see id.*, and finally, it is necessary to establish that it is " 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561, 112 S.Ct. at 2136 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)).

324 F.3d 1229, 1241 (11th Cir.2003).

As this test is applied here, the caselaw makes clear that a plaintiff living in an underrepresented district suffers a discrete representational harm from the disproportionate weakness of his vote as compared to the vote possessed by a resident of an overrepresented district. Moreover, this injury is caused by the apportionment scheme that generated the boundaries of the district in which the plaintiff lives and, equally clearly, is remediable by the invalidation of that scheme. This is all that is needed for Article III standing.[11]

20, which has a population deviation of 4.75%; plaintiff Seth Harp lives in state Senate district 16, which has a population deviation of 4.97%; plaintiff David Markey lives in state Senate district 21, which has a population deviation of 4.98%, and state House district 35, which has a population deviation of 4.98%; plaintiff Felix Moring lives in congressional district 3, which has a population deviation of +21 people; plaintiff Robert H. Owen, Sr. lives in state Senate district 56, which has a population deviation of 4.97% and state House district 41, which has a population deviation of 4.94%; plaintiff Linda Parker lives in state Senate district 21, which has a population deviation of 4.98%, and state House district 15, which has a population deviation of 3.89%; plaintiff Charles Payne, Jr. lives in state Senate district 54, which has a population deviation of 4.68%, and state House district 04, which has a population deviation of 4.92%; plaintiff Roy Roberts lives in congressional district 9, which has a population deviation of +35 people, state Senate district 45, which has a population deviation of 4.97%, and state House district 71, which has a population deviation of 1.82%; plaintiff Nancy Schaefer lives in congressional district 9, which has a population deviation of +35 people, state Senate district 51, which has a population deviation of 4.99% and state House district 07, which has a population deviation of 4.15%; plaintiff Austin Scott lives in congressional district 2, which has a population deviation of +8 people, and state House district 138, which has a population deviation of 3.10%; plaintiffs Bob Tango and Debbie Tango live in state Senate district 37, which has a population deviation of 3.33%, and state House district 28, which has a population deviation of 4.98%; plaintiff Charlie Tanksley lives in state Senate district 32, which has a population deviation of 4.86%; plaintiff Don Thomas lives in state Senate district 54, which has a population deviation of 4.68%, and state House district 05, which has a population deviation of 1.87%; plaintiff Marc Tyson lives in congressional district 11, which has a population deviation of +3 people; plaintiff Jack Williamson lives in congressional district 12, which has a population deviation of +8 people, state Senate district 04, which has a population deviation of .10%, and state House district 101, which has a population deviation of 4.95%; and plaintiff David Young lives in state Senate district 56, which has a population deviation of 4.97%, and state House district 38, which has a population deviation of 4.32%.

**11.** We note that the *Vieth* court held that "a plaintiff in a partisan gerrymandering claim need not allege that he lives in a particular district that has been gerrymandered on the basis of political affiliation," 188 F.Supp.2d at 540, and that instead mere membership in the disfavored party (as well as residence in the

In short, to the extent that defendants argue that an underrepresented plaintiff can challenge only the apportionment of his own district, as opposed to the redistricting scheme that resulted in the underrepresentation of that district, such a position is without any basis in law. Thus, we are satisfied that each plaintiff possesses Article III standing to challenge the apportionment of the underrepresented district(s) in which he or she resides, and, accordingly we deny defendants' motion to dismiss their claims for lack of Article III standing.

For the foregoing reasons, we hereby **GRANT** defendants' motions to (1) realign defendant Eric Johnson as a party plaintiff; (2) stay consideration of plaintiffs' complaint challenging Georgia's 2002 State Senate Redistricting Plan; (3) dismiss plaintiffs' claim against the redistricting plans for Congress insofar as it is brought pursuant to 2 U.S.C. § 2c; and (4) dismiss plaintiffs' challenge to the combination of single- and multi-member districts in the 2001 House plan. By contrast, we DENY defendants' Motion to Dismiss Complaint Against the Redistricting Plan for the Georgia State Senate or, in the Alternative, to Join a Party Pursuant to Fed. R.Civ.P. 12(b)(7). We also **DENY** defendants' Motion to Dismiss Plaintiffs' Claims Against the Redistricting Plans for Congress and the Georgia House of Representatives Pursuant to Fed.R.Civ.P. 12(b)(6) insofar as it concerns plaintiffs' "one person one vote" challenges to these plans and their partisan gerrymandering claim.

In addition, we **ORDER** defendants to answer plaintiffs' amended complaint within 10 days of the filing of this order, including plaintiffs' allegations regarding the 2002 Senate plan. Further, we **DIRECT** the parties to promptly notify this court of any ruling of the 3 judge panel of the United States District Court for the District of Columbia regarding the VRA preclearance issues in *Georgia v. Ashcroft.*

state in question) is sufficient to confer standing to assert such a claim. As plaintiffs recognized at oral argument, this holding appears to create an anomalously more lenient test for standing to assert a *political* gerrymandering claim than applies in the context of a *racial* gerrymandering claim. However, since each plaintiff in this case satisfies the more stringent test of district residence derived from racial gerrymandering and "one person one vote" cases, we need not address *Vieth.*